RUTH C. PINKEL (Cal. Bar No. 164470)
Email:  pinkelr@sec.gov
ROBERT C. STILLWELL (Cal. Bar No. 308630)
Email:  stillwellr@sec.gov
DANIEL O. BLAU (Cal. Bar No. 305008)
Email: blaud@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine Zoladz, Regional Director
Gary Y. Leung, Associate Regional Director
Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>       vs.<br><br>LIVE VENTURES INCORPORATED; JANONE INC. (f/k/a Appliance Recycling Centers of America, Inc.); JOHN ISAAC a/k/a JON ISAAC; KINGSTON DIVERSIFIED HOLDINGS LLC; and VIRLAND A. JOHNSON,<br><br>              Defendants. | Case No. 2:21-cv-01433-JCM-MDC<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 172)**<br><br>**Oral Argument Requested** |

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   SEC'S STATEMENT OF UNDISPUTED MATERIAL FACTS................................1

      A.    The Defendants .........................................................................1

      B.    The 2016 scheme to inflate Live's financials ...................................2

            1.    The Novalk Amendment falsely boosted Live's income in FY16 ........2

                  a.    Live's misrepresentations regarding the Novalk Amendment...2

                  b.    The Effective Date was not approved by professionals............2

            2.    Defendants brazenly misstate Live's EPS ................................3

                  a.    Live's Press Release boasts massively inflated EPS ................3

                  b.    The number of shares of Live common stock was reduced only well after the close of FY16 and the issuance of the Press Release ................................................................3

                  c.    Isaac knew the Press Release was false ...............................3

                  d.    Live's $8.92 EPS figure was not approved by any outside professional ...................................................................3

            3.    Live's stock rises and, through Isaac, it seeks to cash in ......................4

                  a.    Live pays for stock promotion ..........................................4

                  b.    Isaac's trading in the Chardan account ...................................4

                  c.    Through Kingston, Isaac personally profits from the Press Release ...................................................................4

            4.    An author accuses Live of using paid promotion and accounting manipulation; Issac makes false statements to FINRA and shareholders ...........................................................6

      C.    The premature recognition of the ApplianceSmart acquisition ........................6

            1.    Live's public disclosures concerning the ApplianceSmart transaction .6

            2.    Because of a credit agreement with MidCap, ApplianceSmart's lender, ApplianceSmart could not be sold in FY18 Q1 ....................................8

            3.    Under GAAP, the acquisition date for ApplianceSmart should have been determined based on consideration of "all pertinent facts and circumstances" ...................................................................9

            4.    SingerLewak did not audit Live's representations regarding ApplianceSmart and was not provided with "all pertinent facts and circumstances" ...................................................................10

i

        5.    Live deceptively treated money paid by ApplianceSmart to MidCap
              under their preexisting loan agreement as payment by Live to ARCA
              towards the purchase...................................................................................12

    D.    Live failed to fully disclose Isaac's FY16 compensation in its 2017 Proxy
          Statement..........................................................................................................13

    E.    Live failed to devise and maintain a system of internal accounting controls ..14

III.    SEC'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ......................15

    A.    Background .......................................................................................................15

    B.    FY 2016 and Novalk Amendment ....................................................................15

    C.    Jon Isaac's Share Lockup.................................................................................16

    D.    The 2016 10-K and Press Release ....................................................................16

    E.    Kingston Transactions ......................................................................................17

    F.    Live's Agreement with ProTrader Elite............................................................17

    G.    FY2018 and the ApplianceSmart Transaction ..................................................17

    H.    Jon Isaac's Compensation ................................................................................19

    I.    Live's Accounting Controls .............................................................................19

IV.    ARGUMENT ..............................................................................................................20

    A.    Standard for Reliance on Professionals ............................................................20

    B.    Claims 1-7, for Defendants' 2016 conduct centered on the inflation of Live's
          performance metrics..........................................................................................21

        1.    Claim 1: Violations of Section 10(b) of the Exchange Act and Rule
              10b-5(b) for false and misleading statements concerning gain on
              Novalk Amendment.................................................................................21

            a.    There was no agreement on the Novalk Amendment until after
                  FY16 ...........................................................................................21

            b.    Defendants acted with scienter .............................................24

            c.    Defendants did not rely on professionals in good faith ...........25

        2.    Claim 2: Violations of Section 10(b) of the Exchange Act and Rule
              10b-5(b) for materially false and misleading statements in LIVE's
              2016 Press Release.................................................................................28

            a.    The Press Release overstated EPS by 40%............................28

            b.    The Press Release's overstatement was made with scienter....28

        3.    Claim 3: Violations of Section 10(b) of the Exchange Act and Rules

ii

10b-5(a) and 10b-5(c) for 2016 scheme to defraud ............................30

4.   Claim 4: Violation of Section 17(a)(2) of the Securities Act for
materially and false and misleading statements in 2016......................31

5.   Claim 5: Violation of Sections 17(a)(1) and 17(a)(3) of the Securities
Act for 2016 scheme to defraud.........................................................32

6.   Claim 6: Violations of Rule 13b2-2 of the Exchange Act for false
statements to accountants regarding Novalk Amendment..................33

7.   Claim 7: Aiding and abetting violations of Section 10(b) of the
Exchange Act and Rule 10b-5(b)........................................................33

C.   Claims 8-10, for Defendants' 2017-18 conduct related to ApplianceSmart....34

1.   Claim 8: Violations of Section 10(b) of the Exchange Act and Rule
10b-5(b) for false statements in Live's Form 10-Q for Q1 2018........34

a.   Defendants misstated that Live gained effective control of
ApplianceSmart in Q1 2018....................................................35

b.   Defendants acted with scienter ...............................................35

c.   Defendants did not rely on professional in good faith when
representing that Live gained control in Q1 2018 ...................36

2.   Claim 9: Violations of Section 10(b) of the Exchange Act and Rules
10b-5(a) and 10b-5(c) for scheme to create the false appearance that
LIVE acquired ApplianceSmart on December 30, 2017 ....................37

3.   Claim 10: Violations of Rule 13b2-2 of the Exchange Act for false
statements to accountants regarding ApplianceSmart transaction.......38

D.   Other claims (11-17)........................................................................................38

1.   Claim 11: Violation of Rule 13a-14 of the Exchange Act for false
certifications of LIVE's Form 10-K for FY16.....................................38

2.   Claim 12: Violation of Rule 13a-14 of the Exchange Act for false
certification of LIVE's Form 10-Q for Q1 2018 ................................39

3.   Claim 13: Violations of Section 13(a) of the Exchange Act and Rules
12b-20, 13a-1, and 13a-13 thereunder, for misleading filings............39

4.   Claim 14: Violations of Section 13(b)(2)(A) of the Exchange Act for
Failure to Maintain Accurate Books and Records ...............................40

5.   Claim 15: Violations of Section 13(b)(2)(B) of the Exchange Act for
failure to maintain a system of internal accounting controls ..............40

6.   Claim 16: Violations of Section 13(b)(5) of the Exchange Act and
Rule 13b2-1 Thereunder for falsifying books and records .................41

7.    Claim 17: Violations of Section 14(a) of the Exchange Act and Rule 14a-3 Thereunder for soliciting proxies without furnishing required information............................................................................................41

V.    CONCLUSION..........................................................................................42

1

## <u>TABLE OF AUTHORITIES</u>

2

3 <u>CASES</u>

4 *Aaron v. SEC*
   446 U.S. 680 (1980) ............................................................... 31

5
*Avis Budget Group Inc. v. Cal. State*
6    *Teachers' Ret. System*
     552 U.S. 1162 (2008) ............................................................ 30

7
*Bisno v. United States*
8    299 F.2d 711 (9th Cir. 1961) ................................................. 21

9 *Chevron Corp. v. Pennzoil Co.*
   974 F.2d 1156 (9th Cir. 1992) ............................................... 20

10
*Enslow v. United States*
11    811 F. Supp. 503 (C.D. Cal. 1992) ....................................... 22

12 *Ernst & Ernst v. Hochfelder*
   425 U.S. 185 (1976) ............................................................... 24

13
*Herman & MacLean v. Huddleston*
14    459 U.S. 375 (1983) ............................................................. 24

15 *Hollinger v. Titan Capital Corp.*
   914 F.2d 1564 (9th Cir. 1990) ......................................... 24, 34

16
*In re ChinaCast Educ. Corp. Sec. Litig.*
17    809 F.3d 471 (9th Cir. 2015) ............................................... 24

18 *In re Cirrus Logic Sec. Litig.*
   946 F. Supp. 1446 (N.D. Cal. 1996) ................................. 26, 27

19
*In re Galectin Therapeutics, Inc. Sec. Litig.*
20    843 F.3d 1257 (11th Cir. 2016) ........................................... 31

21 *In re Galena Biopharma, Inc. Sec. Litig.*
   117 F. Supp. 3d 1145 (D. Or. 2015) ..................................... 31

22
*In re REMEC Inc. Sec. Litig.*
23    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................ 26, 27

24 *In re Tesla, Inc. Sec. Litig.*
   477 F. Supp. 3d 903 (N.D. Cal. 2020) ................................. 35

25
*Lorenzo v. SEC*
26    587 U.S. 71 (2019) ............................................................... 38

27 *Ponce v. S.E.C.*
   345 F.3d 722 (9th Cir. 2003) ............................................... 40

28

*Prodanova v. H.C. Wainwright & Co., LLC*
    993 F.3d 1097 (9th Cir. 2021) ............................................................... 25

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996) ............................................................... 26

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*
    530 F. Supp. 3d 988 (S.D. Cal. 2021) ................................................... 21

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*
    No. 14-CV-04394-AJN-BCM
    2017 WL 9802844 (S.D.N.Y. Sept. 15, 2017) ...................................... 20

*SEC v. Apartments Am., LLC*
    No. SA CV 12-0754 DOC AN
    2014 WL 842819 (C.D. Cal. Mar. 3, 2014) ...................................... 27, 29

*SEC v. Black*
    2008 WL 4394891 (N.D. Ill. Sept. 24, 2008) ....................................... 40

*SEC v. Burns*,
    816 F.2d 471 (9th Cir. 1987) ................................................................ 24

*SEC v. City of Victorville*
    No. ED CV13-00776 JAK (DTBx)
    2017 WL 11679413 (C.D. Cal. June 2, 2017) ....................................... 34

*SEC v. CMKM Diamonds, Inc.*
    No. 2:08-CV-0437-LRH-RJJ
    2011 WL 3047476 (D. Nev. July 25, 2011) .......................................... 20

*SEC v. e-Smart Techs., Inc.*
    82 F. Supp. 3d 97 (D.D.C. 2015) .......................................................... 41

*SEC v. Goldfield Deep Mines Co. of Nevada*
    758 F.2d 459 (9th Cir. 1985) .......................................... 20, 21, 23, 26

*SEC v. Grybniak*
    No. 20-CV-327(EK)(MMH)
    2024 WL 4287222 (E.D.N.Y. Sept. 24, 2024) ...................................... 37

*SEC v. Holschuh*
    694 F.2d 130 (7th Cir. 1982) ................................................................ 30

*SEC v. Indigenous Glob. Dev. Corp.*
    No. C-06-05600 JCS
    2008 WL 8853722 (N.D. Cal. June 30, 2008) ....................................... 39

*SEC v. Live Ventures Inc.*
    2022 WL 17253784 (D. Nev. Nov. 28, 2022) ....................................... 42

*SEC v. Manor Nursing Ctrs.*
    458 F.2d 1082 (2d Cir. 1979).............................................................. 24

*SEC v. McNulty*
    137 F.3d 732 (2d Cir. 1998)................................................................ 40

*SEC v. Platforms Wireless Int'l Corp.*
   617 F.3d 1072 (9th Cir. 2010) ............................................. 21, 24

*SEC v. Premier Holding Corp.*
   No. CV 18-00813-CJC(KESx)
   2019 WL 8167920 (C.D. Cal. Dec. 10, 2019) ...................... 34

*SEC v. Retail Pro, Inc.*
   No. 08CV1620-WQH-RBB
   2010 WL 1444993 (S.D. Cal. Apr. 9, 2010) ......................... 20

*SEC v. Retail Pro, Inc.*
   No. 08CV1620-WQH-RBB
   2011 WL 4507013 (S.D. Cal. Sept. 28, 2011) ...................... 20

*SEC v. Schooler*
   No. 3:12-CV-2164-GPC
   2015 WL 3491903 (S.D. Cal. June 3, 2015) ......................... 31

*SEC v. Small Cap Rsch. Grp., Inc.*
   226 F. App'x 656 (9th Cir. 2007) ........................................ 25

*SEC v. Tolstedt*
   545 F. Supp. 3d 788 (N.D. Cal. 2021) ................................. 32

*SEC v. Yuen*
   No. CV 03-4376MRP(PLAX)
   2006 WL 1390828 (C.D. Cal. Mar. 16, 2006) ............. 20, 27, 41

*SEC v. Zera Fin. LLC*
   No. SACV 23-01807-CJC (ADSX)
   2023 WL 8269775 (C.D. Cal. Oct. 30, 2023) ...................... 30

*Simpson v. AOL Time Warner, Inc.*
   452 F.3d 1040 (9th Cir. 2006). ...................................... 30, 38

*U.S. v. Crop Growers Corp.*
   954 F. Supp. 335 (D.D.C. 1997) ......................................... 40

**FEDERAL STATUTES**

**Securities Act of 1933**

Section 17(a)(1)
   [15 U.S.C. § 77q(a)(1)] ................................................ 32, 33

Section 17(a)(2)
   [15 U.S.C. § 77q(a)(2)] ...................................................... 31

Section 17(a)(3)
   [15 U.S.C. § 77q(a)(1)] ................................................ 32, 33

**Securities Exchange Act of 1934**

Section 10(b)
   [15 U.S.C. § 78j(b)] ...................................................... 21, 30

Section 12(b)(2)(B)
[15 U.S.C. § 78j(b)(2)(B)] ............................................................. 41

Section 13(a)
[15 U.S.C. § 78m(a)]..................................................................... 39

Section 13(b)(2)
[15 U.S.C. § 78m(b)(2)].................................................................. 41

Section 13(b)(2)(A)
[15 U.S.C. § 78m(b)(2)(A)] ............................................................. 40

Section 13(b)(2)(B)
[15 U.S.C. § 78m(b)(2)(B)] ............................................................. 40

Section 13(b)(5)
[15 U.S.C. § 78m(b)(5)] ................................................................. 41

**FEDERAL REGULATIONS**

Rule 10b–5
[17 C.F.R. § 240.10b-5] ................................................................. 21

Rule 10b-5(a)
[17 C.F.R. § 240.10b-5(a)].............................................................. 30

Rule 10b-5(b)
[17 C.F.R. §§ 240.10b-5(b)] ............................................................ 21

Rule 10b-5(c)
[17 C.F.R. § 240.10b-5(c)].............................................................. 30

Rule 12b–20
[17 C.F.R. § 210.4-01(a)(1)] ........................................................... 39

Rule 13a–1
[17 C.F.R. §§ 240.13a–1] ............................................................... 39

Rule 14a-3
[17 C.F.R. § 229.402] ............................................................. 41, 42

**OTHER AUTHORITIES**

Dodd–Frank Wall Street Reform and
Consumer Protection Act, Pub. L.
No. 111–203, 124 Stat. 1376, § 9290 ............................................... 33

## I. __INTRODUCTION__

There is no dispute that throughout 2016 and 2018, Defendants Live Ventures Incorporated ("Live"), John Isaac ("Isaac"), and Virland A. Johnson ("Johnson") sought to make Live appear more financially successful than it was, and that they sought to capitalize on that illusion. First, they inflated Live's income for financial year 2016 ("FY16") by improperly recognizing a gain on a contract amendment in the quarter before the amendment happened. They also blatantly lied about Live's earning per share ("EPS") in a press release touting their financial results. Then, in financial year 2018 ("FY18"), Live lied about the date of its acquisition of ApplianceSmart so as to recognize "other income" from the acquisition. Live and Isaac, its CEO, sought to monetize these deceptions. For example, in 2016, Live hired stock promoters and sought to sell its stock at a higher price once it announced its inflated EPS for the year, and later lied about it in a publicly-filed letter to shareholders. To make matters worse, in 2016 and in 2018, Isaac misled Live's outside accountants as to key facts concerning their financial results to conceal the fraud.

In its own motion for summary judgment, the SEC details how the key facts surrounding this fraud are undisputed, but defendants now attempt to evade liability through what they claim is an "advice of professionals" defense. They have no evidence to support this defense. In fact, the record establishes that Defendants did not seek advice from accountants or attorneys regarding these issues, did not make a full disclosure of the facts, did not receive advice that the conduct at issue was permissible, and did not follow any such advice in good faith. For these reasons, the SEC requests that the Court grant its motion for summary judgment or, at the very least, find there are genuine disputes of material fact that preclude in its entirety Defendants' motion for summary judgment.

## II. __SEC'S STATEMENT OF UNDISPUTED MATERIAL FACTS__[1]

### A. The Defendants

*See* Fact Nos. ("MPSJF") 1-7, ECF 173 at 11 (SEC's Motion for Partial Summary Judgment

---

[1] Plaintiff incorporates by reference the statement of facts contained in its Motion for Partial Summary Judgment ("MPSJ"), filed at ECF 173. "MPSJF" refers to the SEC's Statement of Facts in its own Motion for Partial Summary Judgment.

("MPSJ") § II.A, at 4).

**B. The 2016 scheme to inflate Live's financials**

**1. The Novalk Amendment falsely boosted Live's income in FY16**

*See* MPSJF Nos. 8-27, ECF 173 at 11-14 (MPSJ § II.B, at 4-6).

**a. Live's misrepresentations regarding the Novalk Amendment**

*See* MPSJF Nos. 28-48, ECF 173 at 13-16 (MPSJ § II.C, at 6-9).

**b. The Effective Date was not approved by professionals**

1. Live's auditors at the time of the FY16 10-K were Anton and Chia ("A&C"). On December 28, 2016, Isaac signed a management representation letter to A&C. ECF 173-5 at 3-5. Isaac represented: "On December 7, 2016, [Live] and Novalk memorialized an agreement which is effective September 15, 2016 that changes the terms and conditions relating to payment of the outstanding software license fee of $1,500,000. . . . As a result of this agreement, [Live] recorded $915,500 of other income in September 2016 . . . ." *Id.* at 4. Isaac's management representation letter did not disclose that Live and Novalk had not agreed to the terms of the Novalk Amendment until well after the end of FY 2016. *Id.*

2. There is no evidence that Live disclosed to A&C that Isaac and Yunis were still negotiating contract terms as of November 30, 2016. There is no evidence that A&C was asked to evaluate whether the gain on the Novalk Amendment could be recognized in FY16 despite the fact that the parties had not agreed to the amendment before November 30, 2016. There is no evidence that A&C offered an opinion on whether Live could recognize the gain in FY16 from a contract amendment agreed to in FY17.

3. Attorney Katz, who drafted the Novalk Amendment, conceded that his understanding of the effective date was based on what he was told by Isaac and Yunis. Opposition Declaration of Robert C. Stillwell ("ODS") Ex. 94 (February 14, 2024 Katz Deposition Transcript ("Katz Tr.")) at 73:2-73:6, 75:13-76:2. He was not aware that, as of November 30, 2016, Isaac and Yunis were still negotiating the terms of the amendment. *Id.* at 81:22-82:1. Katz testified that, if substantive deal terms were still being negotiated as of November 30, 2016, that might change his opinion about the effective date. *Id.* at 76:7-76:21. Katz testified that contract price and the number of

shares are material terms. *Id*. at 78:21-24, 79:6-14.

> **2. Defendants brazenly misstate Live's EPS**
>
> **a. Live's Press Release boasts massively inflated EPS**

*See* MPSJF Nos. 52-62, ECF 173 at 16-18 (MPSJ § II.D.1, at 9-11).

> **b. The number of shares of Live common stock was reduced only well after the close of FY16 and the issuance of the Press Release**

*See* MPSJF Nos. 63-74, ECF 173 at 18-19 (MPSJ § II.D.2, at 11-12).

> **c. Isaac knew the Press Release was false**

*See* MPSJF Nos. 75-83, ECF 173 at 19-20 (MPSJ § II.D.3, at 12-13).

> **d. Live's $8.92 EPS figure was not approved by any outside professional**

4.  On December 27, 2016, Isaac sent multiple drafts of the Press Release to Live's outside counsel, Randy Katz, for review. Katz returned a draft to Isaac with edits and comments. ECF 172-19. Isaac did not adopt all of Katz's suggestions. With respect to the Press Release's representation that Live's financial results "were filed today with the [SEC]," Katz proposed: "Or 'will be filed tomorrow' depending on timing." *Id.* at 2. Isaac did not adopt the edit. *See* ECF 173-3 at 2.

5.  Katz did not review the Press Release's EPS calculation for accuracy. During his deposition, Katz was asked if he had had "any concerns" about the Press Release. Katz replied: "From a legal perspective, no." ODS Ex. 94 (Katz Tr.) at 46:19-47:1. Katz confirmed that he is not an accountant and "can barely balance [his] checkbook." *Id*. at 59:21-60:2. Katz did not know whether the $8.92 EPS figure announced in the Press Release had been calculated in accordance with GAAP. *Id*. at 64:4-12.

6.  There is no evidence that Live's auditor for FY16, A&C, approved the Press Release or the $8.92 EPS figure prior to the Release's distribution. Isaac testified that, as a general matter, A&C would review every Live press release before it was distributed. ODS Ex. 90 (August 16, 2019 Isaac Investigative Testimony Transcript ("Isaac 8/16/19 Inv. Tr.")) at 344:6-9. Isaac did not testify as to whether Live or Isaac required A&C to approve any or every press release for publication. *See id*. In any case, there is no evidence that Isaac sent any draft of the Press Release

to A&C, or that Isaac had any other communication with A&C concerning the Press Release, prior to the distribution of the Press Release. ODS ¶ 19. During Isaac's deposition, the SEC asked Isaac if he had asked Live's outside auditor to review the calculation of the $8.92 EPS figure before Isaac authorized the distribution of the Press Release; Isaac declined to answer, asserting his Fifth Amendment rights. ODS Ex. 91 (May 14, 2024 Isaac Deposition Transcript ("Isaac 5/14/2024 Depo. Tr.")) at 23:10-24:3.

7.    By contrast, on December 26, 2016, Isaac sent an email to an accountant at BDO USA, LLP (formerly known as BDO Seidman, LLP) ("BDO"), asking the accountant to review an excerpt from the Press Release discussing Live's net operating losses ("NOLs"). ODS Ex. 62. In 2016, Live had engaged BDO to do a study of the NOLs. ODS Ex. 63. Live published the Press Release before BDO responded to Isaac's email. ODS Ex. 64.

### 3.    Live's stock rises and, through Isaac, it seeks to cash in

#### a.    Live pays for stock promotion

*See* MPSJF Nos. 84-95, ECF 173 at 20-21 (MPSJ § II.E, at 13-14).

#### b.    Isaac's trading in the Chardan account

*See* MPSJF Nos. 96-104, ECF 173 at 21-22 (MPSJ § II.F, at 14-15).

#### c.    Through Kingston, Isaac personally profits from the Press Release

8.    In or around December 2016, Juan Yunis acquired a Delaware entity called Kingston Diversified Holdings LLC ("Kingston"). ODS Ex. 98 (February 13, 2024 Yunis Deposition Transcript ("Yunis Tr.")) at 129:3-5; 134:9-135:5. Isaac introduced Yunis to the individual from whom Yunis acquired Kingston. *Id.* at 129:10-14; 130:14-24. The amount Yunis paid for Kingston "wasn't a lot of money," and less than $500,000. *Id.* at 140:8-11; 140:21-141:1. In December 2016, Kingston owned securities worth over $2.9 million. ODS Ex. 58 at 1.

9.    Yunis was Kingston's sole member. ODS Ex. 56 at 2. In the December 7, 2016, certificate of amendment for Kingston, filed with the Delaware secretary of state, Yunis's address was listed as 3525 Del Mar Heights Road, Suite 765, San Diego. *Id.* This was the same address listed for Isaac Capital Group in Live's Form 10-K for FY16. ODS Ex. 74 at 24.

10. Kingston maintained a brokerage account at Fidelity Brokerage Services ("Fidelity").

ODS Ex. 58. As of December 31, 2016, Kingston's address of record at Fidelity was 12520 High Bluff Drive, Suite 140, San Diego, which was an office maintained by Isaac. *Id*. at 1; ODS Ex. 90 (Isaac 8/16/19 Inv. Tr.) at 387:13-388:5.

11. On December 6, 2016, Isaac impersonated Yunis on a telephone call with Fidelity. During the call, Isaac changed the login information associated with Kingston's online Fidelity account. Id. at 500:19-504:24.

12. During the early morning hours of December 28, 2016, numerous limit orders to sell shares of Live (*i.e.*, orders to sell shares of Live at specified, minimum prices) were placed in Kingston's Fidelity account. ODS Ex. 53. Most of the orders were placed between 1:36 a.m. ET and 2:51 a.m. ET. *Id*. During that period, Kingston's Fidelity account was primarily accessed from a variety of IP addresses associated with the TOR browser. ODS Ex. 54; Mot. 9, ¶ 37. On four occasions, Kingston's Fidelity account was accessed from an IP address associated with Isaac's residence in Las Vegas. *Id.* Yunis testified that he placed these orders from Isaac's IP address using a virtual private network (VPN). ODS Ex. 98 (Yunis Tr.) at 151:19-152:18.

13. Most of the orders placed in Kingston's Fidelity account on December 28, 2016, set limit prices that were higher than Live's highest share price during the December 28 trading day, and went unexecuted. ODS Ex. 53. However, five of Kingston's orders were executed, generating gross proceeds of approximately $48,000. ODS Ex. 58 at 14.

14. Kingston's proceeds from the December 28, 2016 trades remained in Kingston's Fidelity account for nearly a year. In late 2017, nearly the entire cash balance in Kingston's Fidelity account ($240,370) was transferred through Kingston and Novalk bank accounts to Isaac's personal bank account, as set forth below:

| Date | Transaction & Amount | Source |
|---|---|---|
| November 17, 2017 | $240,374.02 was wired from Kingston's Fidelity account to Kingston's bank account (leaving $86.88 in Kingston's Fidelity account) | ODS Ex. 65 at 2-3; ODS Ex. 66 at 2. |
| December 14, 2017 | $242,000 was transferred from Kingston's bank account to Novalk's bank account (leaving $1,518.87 in Kingston's bank account) | ODS Ex. 67 at 2. |
| December 14, 2017 | $242,000 was wired from Novalk's bank account to Jon Isaac's personal bank account (leaving $2,292.98 in Novalk's bank account) | ODS Ex. 68 at 2; ODS Ex. 52 at 6; ODS Ex. 90 (Isaac 8/16/19 Inv. Tr.) at 410:16-411:17. |

15. At the time of these transfers, Isaac was sourcing funds to make a down payment on a house in Las Vegas. ODS Ex. 90 (Isaac 8/16/19 Inv. Tr.) at 405:19-411:25. Isaac testified that the $242,000 transfer was part of a $742,000 loan from Yunis. *Id.* at 405:19-409:25. Yunis similarly testified that he loaned Isaac a total of $742,000 in 2017, which Yunis extended to facilitate Isaac's home purchase. ODS Ex. 98 (Yunis Tr.) at 164:2-18. On December 18, 2017, Yunis sent a letter to Isaac addressed "to whom this may concern," in which Yunis represented that Novalk had paid $742,000 to Isaac Capital Group "for work performed through November 30, 2017." ODS Ex. 57 at 2. Isaac forwarded Yunis's letter to a mortgage broker. Id. at 1; ODS Ex. 90 (Isaac 8/16/19 Inv. Tr.) at 496:1-16. During his deposition, Yunis testified that his letter's representation that Novalk had paid Isaac Capital Group "for work performed" was false. ODS Ex. 98 (Yunis Tr.) at 168:25-169:3. According to Yunis, Isaac had told him that "[Isaac] needed a favor from me to make a letter . . . for something for his house," and that he "just helped [Isaac] because . . . we have a good relationship and he was a friend." *Id.* at 167:1-168:12.

**4. An author accuses Live of using paid promotion and accounting manipulation; Issac makes false statements to FINRA and shareholders**

*See* MPSJF Nos. 105-118, ECF 173 at 22-24 (MPSJ § II.G, at 15-17).

**C. The premature recognition of the ApplianceSmart acquisition**

**1. Live's public disclosures concerning the ApplianceSmart transaction**

16. On January 5, 2018, Live filed a Form 8-K with the SEC in which Live disclosed that ApplianceSmart Holdings LLC ("ASH"), a wholly-owned subsidiary of Live, had entered into a Stock Purchase Agreement ("SPA") with Appliance Recycling Centers of America, Inc. ("ARCA") on December 30, 2017, for the purchase of ARCA subsidiary ApplianceSmart. ODS Ex. 76 at 2. The filing disclosed that Isaac's father, Tony Isaac, was the CEO of ARCA and ApplianceSmart. *Id.* At the time, Johnson was the CFO of both Live and ARCA. ODS Ex. 92 (October 29, 2019 Johnson Investigative Testimony Transcript ("Johnson 10/29/2019 Tr.")) at 108:21-109:1. According to the filing, ASH had agreed to purchase "all of the issued and outstanding shares of capital stock" of ApplianceSmart, an appliance retail chain, in exchange for $6,500,000 (the "Purchase Price"). ODS Ex. 76 at 2. The filing further represented that "[t]he

6

1    shares of [ApplianceSmart] Stock were delivered into escrow" and would be released to ASH

2    upon its payment of the Purchase Price. *Id*. The earliest, fully executed version of the SPA

3    produced by Live was created on January 4, 2018. ODS ¶ 37, Ex. 71.

4        17. Live (through its subsidiary, ASH) and ARCA entered into two agreements in connection

5    with the ApplianceSmart transaction: the SPA [ECF 172-5], and a "Transition Services

6    Agreement" ("TSA") [ECF 172-55]. Under the TSA, ARCA agreed to continue to provide

7    certain services to ApplianceSmart employees, namely, the administration of employee benefits.

8    ECF 172-55 at 3, 12 of 12.

9        18. On February 14, 2018, Live filed its Form 10-Q for the first quarter ("Q1") of Live's

10   fiscal year 2018 ("FY18"), which ended on December 31, 2017, with the SEC. ODS Ex. 79.

11   Isaac signed and certified the filing as Live's CEO and principal executive officer. *Id*. at 25, 26,

12   28. Johnson signed and certified the filing as Live's CFO and principal financial officer. *Id*. at

13   25, 27, 29.

14       19. In Live's Form 10-Q for FY18 Q1, Live represented that it had "acquired"

15   ApplianceSmart and identified December 30, 2017, as the "ApplianceSmart Closing Date." *Id*. at

16   9. In the Form 10-Q, Live represented that "[t]he shares of [ApplianceSmart] Stock were

17   delivered into escrow and will be released to [ASH] upon [ASH's] receipt of third-party

18   financing in an amount sufficient to fund the Purchase Price, and the subsequent delivery of such

19   funds to certain third-party lenders of ARCA and ApplianceSmart, all of which the parties expect

20   to occur prior to March 31, 2018." *Id*. at 11.

21       20. By identifying December 30, 2017, as the "ApplianceSmart Closing Date," Live boosted

22   its pre-tax income for FY18 Q1 by 246.7%. According to a preliminary purchase price allocation

23   set forth in Live's Form 10-Q for FY18 Q1, the value of the assets that Live had acquired in

24   connection with the ApplianceSmart transaction was $3,773,486 greater than the Purchase Price

25   of $6,500,000. *Id*. at 9. Accordingly, in Live's Form 10-Q for FY18 Q1, Live recorded, as "other

26   income," a "bargain purchase gain" in the amount of $3,773,486. *Id*. at 4, 19. According to

27   Live's Form 10-Q for FY18 Q1, Live's pre-tax income in FY18 Q1 was $5,303,046. *Id*. at 4. By

28   recording $3,773,486 in other income in FY18 Q1 in connection with the ApplianceSmart

transaction, Live increased its pre-tax income for FY18 Q1 from $1,529,560 to $5,303,046, an increase of 246.7%. ODS ¶¶ 55, 56.

21. The timing of the bargain purchase gain was auspicious, as Live's prospects for profitability faced a sudden and significant challenge near the end of Live's FY18 Q1. As a consequence of the passage of the Tax Cuts and Jobs Act on December 22, 2017, Live was required to recognize a one-time income tax expense of $2.3 million in the quarter. ODS Ex. 79 at 11. If Live had recognized its acquisition of ApplianceSmart as having occurred January 1, 2018, or later, Live would not have been able to record a bargain purchase gain in connection with the ApplianceSmart transaction in Live's FY18 Q1. ODS Ex. 95 (September 20, 2024 McKinnon Deposition Transcript ("McKinnon Tr.")) at 236:10-15.

### 2. Because of a credit agreement with MidCap, ApplianceSmart's lender, ApplianceSmart could not be sold in FY18 Q1

22. At the time that Live and ARCA entered into the SPA, ARCA and its subsidiaries, including ApplianceSmart, were parties to a "Credit and Security Agreement dated as of May 10, 2017" with MidCap Financial Trust ("MidCap"), as lender, which the SPA defined as the "MidCap Credit Agreement" ("MCA"). ECF 172-5 at 7; ODS Ex. 55; ODS Ex. 92 (Johnson 10/29/2019 Tr.) at 92:17-93:6.

23. The SPA specifically required ARCA to deliver to Live, "at the Closing," "100% of the issued and outstanding capital stock of [ApplianceSmart]," . . . conveyed free and clear of all Encumbrances . . . , including but not limited to those Encumbrances imposed by the MidCap Credit Agreement." ECF 172-5 at 3.

24. The MCA imposed restrictions on ARCA's use of its assets. Until the MidCap Credit Agreement was terminated in March 2018, MidCap held a security interest in all of ARCA's assets, including ApplianceSmart itself and ApplianceSmart's inventory. ODS Ex. 92 (Johnson 10/29/2019 Tr.) at 70:6-71:23; 90:25-91:3. Under the MCA, ARCA covenanted that it would not sell any of its assets, except in the ordinary course of business or as permitted by MidCap, and, separately, that it would not permit any change in control with respect to ApplianceSmart. ODS Ex. 55 at 3 ("Asset Disposition"), 4 ("Change in Control"), 6 ("Permitted Asset Dispositions"), 9

(Section 5.6, "Consolidations, Mergers and Sales of Assets; Change in Control"). Until the MCA was terminated in March 2018, MidCap physically held the stock certificate evidencing ARCA's ownership of ApplianceSmart. ODS Ex. 92 (Johnson 10/29/2019 Tr.) at 71:9-23; 85:9-24.

25. The MCA also imposed restrictions on the operations of ARCA and its subsidiaries. Under the MCA, ApplianceSmart received funds that it used to buy inventory, and then remitted its revenues back to MidCap. *Id.* at 126:18-25. Pursuant to the MCA, proceeds from ApplianceSmart's operations were collected in "lockbox" accounts; the funds in those accounts were swept into a MidCap account on a daily basis. ODS Ex. 55 at 5 ("Deposit Account Control Agreement"), 7 (Section 2.11(a)); ODS Ex. 97 (November 11, 2020 Sirleaf Investigative Testimony Transcript) at Tr. 14:22-25; 114:5-115:11. Johnson acknowledged that, until the MCA was terminated in March 2018, MidCap "had a lock on all of [ApplianceSmart's] proceeds." ODS Ex. 92 (Johnson 10/29/2019 Tr.) at 122:14-123:7. By deceptively characterizing ApplianceSmart's payments to MidCap as payments by Live to ARCA, defendants effectively concealed the fact that Live had had no control over ApplianceSmart's revenue until March 2018.

### 3. Under GAAP, the acquisition date for ApplianceSmart should have been determined based on consideration of "all pertinent facts and circumstances"

26. The GAAP provisions relevant to a company's determination of an acquisition date are ASC 805-10-25-6 and 805-10-25-7. ODS Ex. 95 (McKinnon Tr.) at 233:25-235:16. ASC 805-10-25-6 instructs an acquiring company to "identify the acquisition date, which is the date on which it obtains control of the acquiree." ODS Ex. 70 at 1. ASC 805-10-25-7 provides: "The date on which the acquirer obtains control of the acquiree generally is the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree — the closing date. However, the acquirer might obtain control on a date that is either earlier or later than the closing date. For example, the acquisition date precedes the closing date if a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date. An acquirer shall consider all pertinent facts and circumstances in identifying the acquisition date." *Id.*

27. In a memo to Live's outside accountants dated May 15, 2018, Johnson represented that he had determined the ApplianceSmart acquisition date to be December 30, 2017, in accordance with ASC 805-10-25-6 and 805-10-25-7. ECF 172-15 at 38.

28. As set forth above, ASC 805-10-25-7 provides that, "generally," the acquisition date is "the closing date," *i.e.*, the date on which "the acquirer legally transfers the consideration." ODS Ex. 70 at 1. In a February 14, 2018, management representation letter to Live's outside accountants, Johnson acknowledged that "consideration has not transferred at December 31, 2017." ECF 172-8 at 3-4. As such, as Live's expert acknowledged, Live's identification of December 30, 2017, as the ApplianceSmart acquisition date necessarily had to have relied on factors other than an identification of the "closing date." ODS Ex. 95 (McKinnon Tr.) at 242:3-7; *see also* ODS Ex. 70 at 1 (ASC 805-10-25-7).

**4. SingerLewak did not audit Live's representations regarding ApplianceSmart and was not provided with "all pertinent facts and circumstances"**

29. On February 6, 2018, Live appointed SingerLewak LLP ("Singer") to be the Company's independent registered public accounting firm. ODS Ex. 78 at 2. Singer performed quarterly reviews of Live's Forms 10-Q for the quarters ended December 31, 2017, March 31, 2018, and June 30, 2018. ODS Ex. 88 (May 6, 2024 Doran Deposition Transcript ("Doran Depo. Tr.")) at 163:21:164-3. Singer resigned as Live's independent registered public accounting firm on October 12, 2018. ODS Ex. 83 at 2. Singer did not perform any work related to the audit of Live's financial statements for FY18. ODS Ex. 88 (Doran Depo. Tr.) at 156:25-157:7. In a Form 8-K announcing Singer's resignation, Live confirmed: "SingerLewak did not audit nor provide an opinion on any of the Company's financial statements." ODS Ex. 83 at 2.

30. Singer's engagement partner with respect to the Live Ventures engagement was Suzie Doran. ODS Ex. 88 (Doran Depo. Tr.) at 19:8-10. Doran explained that a quarterly review is "less in scope than an audit." *Id.* at 76:11-24. A quarterly review entails "limited procedures, which include[] analytical procedures and inquiries with management. We also get a representation letter." *Id.* at 74:19-75:7. Doran testified that "an audit . . . is very, very different." *Id.* at 75:8-11. An audit entails "a much higher level of corroboration than inquiries and

1   analytical procedures." *Id*. at 180:6-15. "[A]n audit has an objective of providing expression of

2   opinion." *Id*. at 76:22-24.

3       31. In connection with Singer's review of Live's Form 10-Q for FY18 Q1, Live provided

4   Singer with a management representation letter dated February 14, 2018. ECF 172-8. The letter

5   was signed by Live's CEO, Isaac, and Live's CFO, Johnson. *Id*. at 5. In the letter, Isaac and

6   Johnson represented: "The shares of ApplianceSmart stock are in escrow and will be released

7   upon payment of the purchase price to third-party lenders of ARCA and ApplianceSmart . . . ."

8   *Id*. at 3. At the time, MidCap physically held the stock certificate evidencing ARCA's ownership

9   of ApplianceSmart. ODS Ex. 92 (Johnson 10/29/2019 Tr.) at 71:9-23; 85:9-24. In a memo to

10  Doran dated May 15, 2018, Johnson acknowledged: "In section 3.01 [of the SPA] it mentions an

11  escrow agent and an escrow. Neither of these things took place." ECF 172-15 at 39. During

12  investigative testimony, Doran testified that Johnson's memo was "unfamiliar" to her and that

13  she did not recall seeing Johnson's disclosure in her workpapers. ODS Ex. 87 (January 12, 2021

14  Doran Investigative Testimony Transcript ("Doran Inv. Tr.")) at 155:17-156:5. Doran testified

15  that the existence of an escrow arrangement was "one of the factors that . . . would have to be

16  considered in determining if transfer of title and ownership had occurred as of December 30,

17  2017." *Id.* at 136:23-137:5. Doran further testified that the lack of an escrow arrangement was

18  "definitely something I would have considered and asked additional inquiries on." *Id.* at 157:25-

19  158:5.

20      32. Separately, Doran testified that she had not been made aware of the fact that Live had no

21  practical ability to control the use of proceeds from ApplianceSmart's operations until March

22  2018, due to the lockbox arrangement imposed under the MidCap Credit Agreement. Id. at

23  169:13-25. Doran testified that the lockbox arrangement was "something that I would definitely

24  have additional inquiries on with regards to determining if control had passed." *Id*. at 170:1-10.

25      33. In Johnson's May 15, 2018, memo to Singer, Johnson represented that "[c]ontrol was

26  established by written contract signed by both [ASH] and [ARCA]." ECF 172-15 at 38.

27  However, neither the SPA nor the TSA anywhere provided that Live would obtain control of

28  ApplianceSmart "on a date before the closing date," as contemplated by ASC 805-10-25-7. *See*

11

1   *generally* ECF 172-5; ECF 172-55.

2        34. In a memo to Doran dated April 20, 2018, Johnson represented that "[m]anagement of

3   LIVE had control of the operations [of ApplianceSmart] as of close of business December 30,

4   2017." ECF 172-15 at 31. However, ARCA's CEO, Tony Isaac, remained the CEO of

5   ApplianceSmart until February 2018. Tony Isaac signed the SPA, which was "dated as of

6   December 30, 2017," in his capacity as CEO of ApplianceSmart, Inc. ECF 172-5 at 17. It was

7   only on or about February 16, 2018, that ApplianceSmart's Board of Directors adopted a

8   resolution electing Jon Isaac to be ApplianceSmart's CEO. ODS Ex. 61 at 1, 2, 4. At the time,

9   the composition of ApplianceSmart's Board of Directors was the same as that of ARCA's Board

10  of Directors. *Compare* ODS Ex. 61 at 6 *with* ODS Ex. 86 at 3, 6. As of February 13, 2018, Tony

11  Isaac was still signing loan documents on behalf of ApplianceSmart as its CEO/President. ODS

12  Ex. 72 at 3, 5, 6 (notarization).

13       35. Ultimately, in Johnson's April 20, 2018, memo to Doran, Johnson set forth Live's

14  "[c]onclusion" that "LIVE had effective and actual control of ApplianceSmart Inc. as of

15  December 30, 2017 . . . ." ECF 172-15 at 33. During Doran's deposition, defendants' counsel

16  asked Doran if she "[had] any disagreement with [Johnson's] conclusion." Doran testified: "We

17  did not do audit procedures, so I can't conclude definitively if we would have reached the same

18  conclusion, because we didn't do audit procedures." ODS Ex. 88 (Doran Depo. Tr.) at 126:13-

19  127:18.

20       **5.  Live deceptively treated money paid by ApplianceSmart to MidCap under their**

21           **preexisting loan agreement as payment by Live to ARCA towards the purchase**

22       36. On April 26, 2018, Live filed a Form 8-K in which Live provided additional information

23  concerning ASH's payment of the ApplianceSmart Purchase Price. ODS Ex. 80. In the filing,

24  Live disclosed that its subsidiary, ASH, had issued a promissory note to ARCA in the amount of

25  $3,919,494.46. *Id.* at 2. According to the filing: "The remaining $2,580,505.54 of the Purchase

26  Price was paid in cash by [ASH] to [ARCA]." *Id.* At the time of the filing, ASH had not made

27  any payment to ARCA towards the ApplianceSmart Purchase Price. Rather, the amount of the

28  purported payment disclosed in the press release, $2,580,505.54, represented the difference

between the total of ApplianceSmart's remittances to MidCap from December 30, 2017, through March 26, 2018 ($13,772,239.52), and the total of ApplianceSmart's borrowings under the MidCap Credit Agreement during the same period ($11,191,733.98). ODS Ex. 92 (Johnson 10/29/2019 Tr.) at 123:9-22. During testimony, Johnson confirmed that the idea to treat ApplianceSmart's payments to MidCap as if they represented a payment by ASH to ARCA was "probably [his]." *Id.* at 123:19-22. On April 6, 2018, Johnson sent an email to Isaac and Tony Isaac with his proposed treatment of ApplianceSmart's payments to MidCap. ODS Ex. 59. On April 22, 2018, Isaac advised Live's general counsel, Michael Stein, that it "[w]ould be nice if you emphasized in the 8k that the company paid $2.5m in cash, leaving $4m in a note, then describe the note .. I'm using approximate numbers)." ODS Ex. 60 at 1. Live's April 26, 2018, Form 8-K adopted Isaac's formulation. ODS Ex. 80 at 2 ("The remaining $2,580,505.54 of the Purchase Price was paid in cash by [ASH] to [ARCA]."). Live repeated the disclosure in its Form 10-Q for FY18 Q2. ODS Ex. 81 at 4 ("The remaining $2,580,506 was paid in cash by ASH to [ARCA].").

**D. Live failed to fully disclose Isaac's FY16 compensation in its 2017 Proxy Statement**

37. Isaac's initial employment agreement with Live, which was in effect during the period of January 1, 2013 through January 1, 2016, provided that Live would "reimburse" Isaac for a "reasonable housing expense." ODS Ex. 51 at 1, 2. In January 2018, Isaac and Live entered into an amendment to Isaac's employment agreement, which was "deemed to be effective as of January 1, 2016," and which similarly provided that Live would "reimburse" Isaac for a "reasonable housing expense." ODS Ex. 77 at 12.

38. On August 9, 2016, Live wired $120,000 to Isaac as reimbursement for housing expenses. ODS Ex. 52 at 1-2; ODS Ex. 90 (Isaac 8/16/19 Inv. Tr.) at 394:18-395:3; 395:25-396:8; 397:5-7.

39. On June 2, 2017, Live filed a definitive proxy statement, signed by Isaac, in advance of an annual meeting to be held in July 2017 (the "2017 Proxy Statement"). ODS Ex. 75 at 4, 23. With the 2017 Proxy Statement, Live solicited proxies from stockholders in connection with the election of Live's Directors, among other things. *Id.* at 5. In the 2017 Proxy Statement, Live

1   included a table disclosing the compensation of Live's named executive officers. *Id*. at 18.

2   According to the table, Isaac received a salary of $200,000 and an option award in each of FY

3   2015 and FY 2016, as well as a stock award in FY 2015. The table disclosed no other

4   compensation received by Isaac in either year. *Id*.

5       40. On June 25, 2018, Live filed a definitive proxy statement in advance of an annual

6   meeting to be held in July 2018 (the "2018 Proxy Statement"). ODS Ex. 82 at 2. According to

7   the 2018 Proxy Statement, in FY 2016, in addition to his salary and option award, Isaac had

8   received $54,000 in "other compensation" in FY 2016. Id. at 19. According to a footnote, Isaac's

9   "other compensation" had been "accrued by [Live] for the reasonable housing allowance to

10  which Mr. Isaac is entitled under his employment agreement." *Id*.

11      **E.  Live failed to devise and maintain a system of internal accounting controls**

12      41. At all times relevant to the events described herein, Live had an "Accounting Policies &

13  Procedures Manual," which was last revised on October 1, 2016. *See* ECF 172-31. The manual

14  provided that "[a]ll figures shown in [Live's] quarterly financial statements and footnotes shall

15  be adequately supported," and that "[a]ll figures shown in the year-end financial statements and

16  footnotes shall be adequately supported." *Id.* at 5. The manual did not provide any policies or

17  procedures specifically relevant to Live's accounting for business combinations. *See generally*

18  ECF 172-31.

19      42. In Live's Form 10-K for FY16, Live disclosed that its "internal control over financial

20  reporting was not effective as of September 30, 2016 due to the lack of timely determination" of

21  the "purchase price allocation" for a subsidiary that Live had acquired in fiscal year 2015. ODS

22  Ex. 74 at 22.

23      43. In Live's Form 10-K for FY17, which Live filed with the SEC on January 18, 2018, Live

24  disclosed that its "internal control over financial reporting was not effective as of September 30,

25  2017." ODS Ex. 77 at 3. Among other "material weaknesses," Live disclosed a "lack of

26  sufficient controls around the financial reporting process" and a "lack of sufficient controls

27  around the process for business combinations." *Id.* Live represented that it was "developing a

28  plan of remediation to strengthen our overall internal control over accounting for business

combinations," including the "hir[ing] [of] resources with specific . . . business combinations and financial accounting expertise . . . ." *Id*.

44. In Live's Form 10-K/A for FY18, Live disclosed that its "internal control over financial reporting was not effective as of September 30, 2018." ODS Ex. 84 at 3.

45. In Live's Form 10-K for FY19, Live disclosed that its "internal controls over financial reporting were ineffective as of September 30, 2019." ODS Ex. 85 at 3. Among other deficiencies, Live disclosed that it did "not have written documentation of our internal control policies and procedures." *Id*. at 4.

III. **SEC'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

The SEC disputes the following paragraphs of Defendant's statement of facts:[2]

A. **Background**

B. **FY 2016 and Novalk Amendment**

¶ 6: disputed. Discussions regarding amending the purchase price were ongoing as of November 30, 2016. MPSJF Nos. 12-14 (ECF 173 at 11-12).

¶ 7: disputed. *See* response to ¶ 6.

¶ 8: disputed, to the extent that it mischaracterizes the evidence and is therefore misleading. *See* response to ¶ 6.

¶ 9: disputed as misleading because it omits that the purported agreement announced by that email had a different effective date (September 30, 2016) than that ultimately agreed to, and thus shows that there was, as of the date of the email, no agreement between Live and Novalk as to the amendment. MPSJF Nos. 15-19 (ECF 173 at 12).

¶ 10: disputed. The Effective Date recited in the Novalk Amendment does not accurately reflect the date that agreement on the amendment was reached. *See* response to ¶ 6. Disputed that the agreement was executed on December 7, 2016. No. 17 (ECF 173 at 12).

---

[2] For purposes of this motion only, the SEC does not dispute the following from Defendants' statement of facts: ¶¶ 1-5,11-13,16, 17, 19, 20, 22, 28, 34, 35, 37, 43, 49, 50-53, 55, 58, 60, 62, 64-67, 70, 76-79. However, in many of these cases, while the SEC cannot dispute that the fact accurately states the contents of a given document, the SEC would and does dispute the truth of that content. *See, e.g.*, ¶¶ 19, 20, 37.

¶¶ 14 and 15: disputed. Mischaracterizes Katz's testimony about when and how he was informed of the alleged September 15 "effective date." § II, *supra* (SEC's Statement of Facts ("SF")) No. 3.

¶ 18: disputed. There is no evidence that A&C were told the Amendment was still being negotiated at least as late as November 30, 2016, well after the close of FY16. SF 2.

¶ 21: disputed that A&C "analyzed the Novalk Amendment" and concluded that price decrease was "appropriate." It was represented to A&C that effective date of agreement was September 15, 2016, and there is no evidence that A&C were told that the Amendment was still being negotiated as of November 30, 2016. SF 2.

¶ 23: disputed. The 10-K did not disclose that the Novalk Amendment was being negotiated as of November 30, 2016, and that the final terms were not agreed to as of December 5, 2016. *See* response to ¶ 6.

¶¶ 24 to 26: disputed. There is no evidence that A&C were ever given full "details," "full disclosure," or had "full knowledge" of the facts surrounding the negotiation of the Novalk Amendment, specifically with respect to the fact that the amendment was being negotiated as of November 30, 2016, and the final terms were not agreed to as of December 5, 2016. SF 1, 2.

**C.  Jon Isaac's Share Lockup**

¶ 27: disputed. This paragraph amalgamates multiple misleading and inaccurate assertions and arguments which misrepresent the date that ICG's common shares were exchanged for Series B shares and how many common shares were outstanding as of the December 28 Press Release. MPSJF Nos. 63-74 (ECF 173 at 18-19).

**D.  The 2016 10-K and Press Release**

¶ 29: disputed. The "newly reduced [count of] 2.0 million outstanding shares" did not occur until (1) after the close of FY16 and (2) after the date of the Press Release. SF 27. Footnote 4 contains factually unsupported and irrelevant speculation.

¶ 30: disputed. The Press Release inaccurately stated that Live's common stock had already been reduced, when it had not. It also did not specify that this reduced share count was used to specify the EPS figure contained in the Press Release. MPSJF Nos. 73, 74 (ECF 173 at 19).

¶ 31: disputed. Live did not disclose the accurate share count for the period covered by the Press Release. MPSJF Nos. 57, 58, 60, 61 (ECF 173 at 17). Live did not disclose that the EPS contained in the Press Release was computed inconsistently with GAAP. MPSJF Nos. 59, 60, 62 (ECF 173 at 17-18).

¶ 32: disputed. Mr. Katz did not review the press release for accuracy or consistency with GAAP. SF 5.

¶ 33: disputed. SF 6.

**E. Kingston Transactions**

¶ 36: disputed. The cited transcript excerpt does not support the assertion that "Mr. Isaac . . . had helped Mr. Yunis with various Kingston-related transactions in the past[.]"

¶ 38: disputed. *See* SF 14 (Isaac received all proceeds from Kingston's trading).

¶ 39: Disputed. It omits the key information that Live attempted to sell stock but was unsuccessful because the stock price did not rise to the price level Isaac set in his orders with the brokerage. MPSJF Nos. 99-103 (ECF 173 at 21-22).

**F. Live's Agreement with ProTrader Elite**

¶ 40: disputed that ProTrader provided only "investor relations and market awareness services." ProTrader Elite provided "marketing efforts" and placed promotional articles. MPSJF Nos. 85-90 (ECF 173 at 20-21).

**G. FY2018 and the ApplianceSmart Transaction**

¶ 41: disputed. The sale was not upon the agreement. Rather, ARCA and Live entered into an agreement whereby ARCA agreed to sell its subsidiary ApplianceSmart upon closing, which would occur upon the terms and subject to the conditions set forth in the SPA. *See* ECF 172-5 (Ex. 92, Dec. 30, 2017 SPA) § 2.01.

¶ 42: disputed. The SPA specifies that the purchase of ApplianceSmart stock would only occur at closing, which was subject to the conditions set forth in the SPA. *Id*.

¶ 44: disputed. Live's management did not have control of ApplianceSmart's operations as of December 30, 2017. *See* SF 34 (ARCA's CEO, Tony Isaac, remained the CEO of ApplianceSmart until February 2018. Tony Isaac signed the SPA, which was "dated as of

December 30, 2017," in his capacity as CEO of ApplianceSmart, Inc. SF 34.

¶ 45: disputed. The TSA specifies that "services will be provided . . . from the Closing Date through the Expiration Date." ECF 172-55 (Ex. H, Dec. 30, 2017 TSA) at 10.

¶ 46: disputed. Johnson cited the relevant accounting guidance, but did not "evaluate[]" the transaction using that guidance, as his determination of the acquisition date contravened that guidance. SF 33, 34.

¶ 47: disputed. Mischaracterizes Stein's testimony. Stein did not state that he agreed with any specific determination of the control date. ECF 172-41 (July 31, 2024 Stein Deposition Transcript) at 125:23-126:19. Moreover, the testimony of attorney Stein is not relevant because defendants have failed to show they made a full disclosure of all facts to Stein, the advice they sought from him, the content of that advice, and that they followed that advice in good faith before they took action.

¶ 48: disputed. The earliest, fully executed version of the ApplianceSmart SPA produced by Live was created on 1/4/2018. ODS Ex. 71, ¶ 27. Also misleading, as Singer never performed an audit of Live. SF 29.

¶ 54: disputed. Live's management did not disclose all pertinent facts and circumstances of the ApplianceSmart transaction. SF 29-34.

¶ 56: disputed that Singer had "full knowledge" of the transaction. SF 29-34.

¶ 57: disputed that the Live Q1 FY18 10-Q "described the ApplianceSmart transaction in detail[.]" Among other thing, the 10-Q falsely represented that "[t]he shares of [ApplianceSmart] Stock were delivered into escrow" [ODS Ex. 79 at 11], which was untrue. SF 19, 31. Footnote 5 to this paragraph is also disputed and irrelevant. Singer's managing partner and member of the ARCA engagement team James Pitrat testified that the ARCA team was not examining the ApplianceSmart acquisition date. ODS Ex. 96 (January 14, 2021 Pitrat Investigative Testimony) at 55:1-5. Moreover, the FY 2018 audit of ARCA was completed after Live filed its misleading 10-Q regarding ApplianceSmart and therefore could not have been relied upon by Live in its determination of the acquisition date.

¶ 59: disputed. Singer did not conduct "audit work." SF 29, 30.

¶ 61: disputed. Johnson omitted relevant facts and circumstances. For example, he did not disclose that until March 2018, Live had no control over ApplianceSmart's revenue, which was swept into account of lender MidCap. SF 30-35.

¶ 63: disputed. Johnson did not "confirm" these facts. For example, MidCap did <u>not</u> hold the stock certificates for ApplianceSmart in escrow. SF 31.

¶ 68: disputed. The May 15, 2018, memorandum was not "fulsome." It did not disclose, among other things, that, until March 2018, Live had no control over ApplianceSmart's revenue, which was swept into the account of lender MidCap. SF 30-35.

¶ 69: disputed. *Id.*

¶ 71: disputed. Singer did not conclude that December 30, 2017, was the appropriate date for change of control. SF 34.

¶ 72: disputed. Description omitted key information. SF 19, 22-25.

¶ 73: disputed. SF 29-35.

¶ 74: disputed. The cited Stein testimony does not support the broad factual proposition claimed by Defendants and is irrelevant. Stein's testimony fails to show Defendants made a full disclosure of all facts to Stein, the advice they sought from him, the content of that advice, and that they followed that advice in good faith before they took action. During his deposition, Defendants repeatedly and specifically instructed Stein to not "reveal[] the content of any protected attorney-client communications or work product," thus preventing any showing of the request made to Stein, if any, and the advice given by Stein, if any, and thereby rendering his statements irrelevant. (Ex. 588 (ECF 172-41) 125:23-126:19.)

¶ 75: misleading and irrelevant. Defendants have failed to show they made a full disclosure of all facts to the auditor, describe the advice sought and received, and that they followed that advice in good faith before they took action.

**H.  Jon Isaac's Compensation**

**I.  Live's Accounting Controls**

¶ 82 is misleading in that it omits key language from the cited FY 2017 10-K about Live's assessment of its ineffective financial reporting having "material weaknesses." SF 43.

¶ 83 is misleading in that it omits key language from the cited FY 2019 10-K about the existence of deficiencies which were "material weaknesses." SF 45.

## IV. ARGUMENT

### A. Standard for Reliance on Professionals

"Courts consistently have held that defendants who claim good faith based upon reliance on a professional must show they '(1) made a complete disclosure to [the professional]; (2) requested [the professional's] advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice.'" *SEC v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *40 (C.D. Cal. Mar. 16, 2006) (alteration in original) (quoting *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985)). "[T]he defendant has the burden of establishing each element of a reliance on counsel defense. *SEC v. CMKM Diamonds, Inc.*, No. 2:08-CV-0437-LRH-RJJ, 2011 WL 3047476, at *3 (D. Nev. July 25, 2011), *aff'd in part, rev'd in part,* 729 F.3d 1248 (9th Cir. 2013) (citing *SEC v. Goldfield Mines Co. of Nevada,* 758 F.2d 459, 467 (9th Cir.1985)).

"The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citing *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991)). Therefore, an assertion of an advice of counsel defense requires defendant to waive the attorney-client privilege (and the work product doctrine) as to the communications and documents relevant to that defense. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394-AJN-BCM, 2017 WL 9802844, at *2 (S.D.N.Y. Sept. 15, 2017).

Claims of good faith based upon reliance on an auditor require the same showing as reliance on counsel. *See Yuen*, 2006 WL 1390828, at *40 (applying *Goldfield* test to "professionals" generally); *SEC v. Retail Pro, Inc.*, No. 08CV1620-WQH-RBB, 2010 WL 1444993, at *6 (S.D. Cal. Apr. 9, 2010) (citing *Goldfield* for elements of reliance on auditors defense); *SEC v. Retail Pro, Inc.*, No. 08CV1620-WQH-RBB, 2011 WL 4507013, at *9 (S.D. Cal. Sept. 28, 2011) (same).

"Advice of [professionals] is not regarded as a separate and distinct defense but rather as a

1   circumstance indicating good faith which the trier of fact is entitled to consider on the issue of

2   fraudulent intent." *Bisno v. United States*, 299 F.2d 711, 719 (9th Cir. 1961). "Even if appellants

3   had established a claim of reliance, 'such reliance does not operate as an automatic defense, but

4   is only one factor to be considered in determining the propriety of injunctive relief.'" *Goldfield*,

5   758 F.2d at 467 (quoting *SEC v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir.

6   1981)).

7   **B.  Claims 1-7, for Defendants' 2016 conduct centered on the inflation of Live's**

8       **performance metrics**

9       **1.  Claim 1: Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) for**

10          **false and misleading statements concerning gain on Novalk Amendment**

11      There is no genuine dispute that Isaac and Live violated Section 10(b) of the Exchange Act

12  and Rule 10b-5(b) thereunder by making false and misleading statements in Live's Form 10-K

13  for FY16. A violation of Section 10(b) and Rule 10b–5 for fraudulent misrepresentations is

14  established if the defendant (1) made a material misrepresentation or omission (2) in connection

15  with the purchase or sale of a security (3) with scienter (4) in interstate commerce. *See SEC v.*

16  *Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010).

17          **a.  There was no agreement on the Novalk Amendment until after FY16**

18      Defendants do not challenge the materiality, nexus with securities, or interstate character of

19  the wrongful recognition of the gain from the Novalk Amendment in Live's FY16 10-K. Instead,

20  they cling to their own lie that "the Novalk Amendment was finalized as of September 15,

21  2016." Motion ("Mot.") 24. But this lie is easily disproven by the record. *First*, Defendants do

22  not point to a single contemporaneous document showing that Live and Novalk so much as

23  *discussed* the amendment to the Novalk Agreement prior to November 30, 2016, more than two

24  months *after* the end of the FY16. Nor can they point to any such records. "[T]he Court will not

25  draw unreasonable inferences and cannot believe evidence that does not exist." *Pulse Elecs., Inc.*

26  *v. U.D. Elec. Corp.*, 530 F. Supp. 3d 988, 998 (S.D. Cal. 2021). As Defendant Isaac said in

27  sworn testimony, if such records exist, Live would have produced them, and it never has. ODS

28  Ex. 89 (November 7, 2018 Isaac Investigative Testimony Transcript) at 270:7-11. *Second*, a key

term of the Novalk Amendment – the effective date, which established the value of the stock Live would pay and thus the gain it could record – was in flux until no earlier than December 5, 2016, when Isaac emailed Johnson with the "good news" that he had negotiated an amendment to the Novalk Agreement with an effective date of **September 30**, not the **September 15** that the parties eventually settled on. MPSJF No. 15. *Third*, Isaac's own sworn testimony from 2019 – during the SEC investigation, before he had an opportunity to manufacture the implausible story he advances today– shows that the negotiations over the Novalk Amendment only began when he emailed Yunis on November 30, 2016. It was "a free ask" to "test the waters" on Novalk's appetite for a price reduction on the purchase of software which was the subject of the Novalk Agreement. MPSJF Nos. 12,13. In other words, there was no agreement to amend the Novalk Agreement by November 30, 2016. Defendants now try to reinvent that exchange as concerning the *cancelation* of the Novalk Agreement, which, they contend, was orthogonal to the supposedly ongoing negotiations over a *modification* to the Novalk Agreement. Mot. 25-26. Not only does this theory lack any evidentiary support, it is belied by Isaac's own sworn testimony. Isaac testified that the purpose of the email was to seek a price reduction (in other words, a modification of the Novalk Agreement). *Id*. Moreover, Novalk's CEO, Juan Yunis, confirmed that, as of November 30, 2016, Live and Novalk had no agreement to alter the Novalk Agreement. *Id*. at No. 14.

Bereft of even a shred of contemporaneous documentary evidence establishing that the Novalk Amendment was agreed to during FY16, Defendants are reduced to a series of arguments that are not supported by the record. *First*, Defendants point to the "Effective Date" listed in the Novalk Amendment itself as proof of the date when the agreement was struck (Mot. 24), but this is the snake eating its own tail. The very basis of the SEC's claim with respect to the Amendment is that the Effective Date did not reflect the actual date that an agreement was reached. "[A]n agreement may purport to establish [a fact of legal significance], however the terms of a contract are not conclusive evidence." *Enslow v. United States*, 811 F. Supp. 503, 506 (C.D. Cal. 1992), *rev'd on other grounds*, 42 F.3d 1399 (9th Cir. 1994).

*Second*, Defendants claim that there is testimony from auditors "who determined that the

appropriate effective date was indeed September 15" (Mot. 24), and yet they cite no such testimony. That is because there is none. Defendants also argue that "Live fully disclosed the facts and timeline of the Novalk Amendment to A&C[.]" Mot. 25. Live never disclosed to A&C that the terms of the Amendment were not agreed to until after FY16, and Live did not seek A&C's advice on the propriety of recognizing a gain in FY16 arising from an agreement reached in FY17. SF 1,2. Instead, the records reflect that A&C was duped just like investors and accepted the truth of what Live was telling them – that an agreement had been reached as of September 15, 2016. "[I]n order to establish good faith reliance . . . appellants must show that they . . . made a complete disclosure . . . ." *Goldfield*, 758 F.2d at 467. Live, having lied to A&C about the effective date, cannot use A&C's assumption that the effective date was accurate to bolster the accuracy of the effective date.

*Third*, Defendants claim that Live's then-outside counsel "testified that he determined September 15 was the appropriate effective date for the Novalk Amendment." Mot. 24. However, not unlike A&C, the witness conceded that his entire understanding of the effective date was based on the incomplete information he was given by Isaac and Yunis. SF 3.

Defendants' attempt to dismiss a particularly damning email is telling. On December 5, 2016, Isaac emailed Johnson with the "good news" that he had negotiated an amendment to the Novalk Agreement such that "the price would now be 350,000 shares (less than half price), at 9/30 closing date, [when Live's] stock price was 1.91." MPSJF No. 15. Defendants have no response to the fact that Isaac announced that he had *news* about a modification to the Novalk Agreement. It really was "news," as Isaac's December 5 email is the earliest contemporaneous record reflecting the potential terms of a 2016 deal to modify the Novalk Agreement.[3] Unable to rebut this point, Defendants instead focus a single excerpt: "we've agreed (as has been the discussion for several months)" to modify the Novalk Agreement, arguing that this snippet shows discussions over the amendment had been ongoing for several months. Mot. 26. But the length of discussions prior to an agreement is irrelevant. As Live's own expert testified, merely discussing

---

[3] Moreover, this email shows that even as of the date of the email, agreement had not been reached on the "effective date" and the value of the gain to be recognized.

an amendment would not constitute a sufficient basis for Live to recognize a gain from the Novalk Amendment in FY16. ODS Ex. 95 (McKinnon Tr.) at 134:9-135:10. It is the date on which agreement was reached that is determinative of when revenue can be recognized under GAAP. Defendants' conflation of the possibility that negotiations had commenced during FY16, with the question of when the parties reached an agreement to modify the contract is unavailing. Moreover, Isaac's assertion that there had been "discussion for several months" is controverted by the fact that there are no contemporaneous records reflecting any discussions regarding what would become the Novalk Amendment prior to November 30, 2016. In sum, all reasonable inferences must be drawn in favor of the non-movant SEC for the purposes of deciding defendants' motion. Based on the lack of *any* records of an agreement on the Amendment prior to December 5, 2016, the *only* reasonable inference to be drawn from the December 5 "news" announcement is that a tentative agreement on the terms of the Amendment (which would change again before the Amendment was finally agreed upon) had only been reached between November 30, 2016, and December 5, 2016.

### b. Defendants acted with scienter

Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter may be established by a showing of "recklessness." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010). Recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987). As the CEO and CFO of Live, Isaac's scienter is imputed to Live. *See, e.g.*, *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) (*en banc*) (holding *respondeat superior* to be a basis for vicarious liability in securities cases); *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (scienter of controlling officers may be imputed to corporation); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1096-97, n.16-18 (2d Cir. 1979).

Isaac's conduct surrounding the backdating of the Novalk Amendment demonstrates that he acted with scienter. He knew that Live and Novalk had not agreed to the terms of the Novalk

Amendment as of November 30, 2016, yet he deliberately used an "effective date" that was months before the agreement actually became final, and he did so for the purpose of capturing "other income" from the transaction in Live's FY16 year-end results. MPSJF No. 11-14. Specifically, he made it appear that Live and Novalk had agreed to the terms of the Novalk Amendment prior to September 30, 2016, for the purpose of fraudulently including $915,500 of "other income" in Live's FY16 results. MPSJF Nos. 15, 16, 25-27. Isaac also changed the "effective date" of the Novalk Amendment from September 30, 2016, to September 15, 2016, a day on which Live's stock price was lower, so as to increase by over $80,000 the "other income" that Live might recognize. MPSJF Nos. 25-27. In sum, Isaac took concerted—*i.e.*, "knowing"— steps to financially engineer Live's FY16 results. A finding of Isaac's scienter is also supported by the other steps he took to manipulate Live's financial results and stock price and to capitalize on that manipulation during this same period, and his efforts to hide those steps from shareholder and auditor scrutiny.

Against this evidence of scienter, Defendants cite an inapposite opinion regarding the particularized allegations necessary to "support a strong inference of scienter" under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1110 (9th Cir. 2021). Mot. 27. Of course, the PSLRA does not apply to SEC enforcement actions. *See, e.g., SEC v. Small Cap Rsch. Grp., Inc.*, 226 F. App'x 656, 657 (9th Cir. 2007). Moreover, unlike the allegations in *Prodanova*, the evidence here specifically established that Isaac was intimately involved in both the negotiations over the Novalk Amendment (and thus knew that the agreement was reached no earlier than November 30, 2016) and the choice of the Effective Date selected for the eventual Novalk Amendment. In short, *Prodanova* is unhelpful because the SEC is not a private litigant and because here, unlike in *Prodnova*, the proof shows that Isaac acted with scienter in backdating the Novalk Amendment.

**c. Defendants did not rely on professionals in good faith**

The bulk of Defendants' argument is spent trying to manufacture a defense through repeated *ipse dixit* assertions that they relied on professionals and thus lack the requisite scienter. But

1   Defendants' efforts to substantiate those bare claims with actual proof fail from the start. They
2   concede that their disclosures to professionals regarding the date of the Novalk Amendment
3   consisted only of the Effective Date and date of execution. Mot. 27 ("Mr. Isaac never tried to
4   hide or obscure the fact that the Novalk Amendment was effective in September but
5   memorialized in December; on the contrary, he repeatedly highlighted this difference in dates to
6   the auditors, attorneys, and Live's internal personnel."). The SEC's claim, however, does not
7   arise from the difference between the purported effective date and the date the Amendment was
8   signed. Rather, the fraud consisted of the recognition of the gain arising from the Novalk
9   Amendment in the financial period before it was in fact agreed to. The false "Effective Date" did
10  not reflect the actual date of agreement. Nor was it only Defendants' disclosures that were
11  insufficient. They fail *every aspect* of the four-part test for good-faith reliance on professionals.

12      Defendants argue that A&C's accounting in FY16, which did not identify any issues with the
13  recognition of the gain from the Novalk Amendment, undercuts scienter. However, Defendants
14  have not established that they "(1) made a complete disclosure [of the date on which agreement
15  was reached]; (2) requested [A&C's] advice as to the legality of the contemplated [recognition of
16  a gain from the Novalk Amendment during FY16]; (3) received advice that [recognizing the gain
17  in FY16 was] legal; and (4) relied in good faith on that advice.'" *Goldfield*, 758 F.2d at 467. The
18  only disclosures to A&C regarding the Novalk Amendment that Defendants point to are: (1) the
19  Novalk Amendment and (2) the management representation letter (which, regarding the date of
20  the Amendment, disclosed only that "On December 7, 2016, the Company and Novalk
21  memorialized an agreement which is effective September 15, 2016 that changes the terms and
22  conditions relating to payment of the outstanding software license fee[.]" SF 1. The records cited
23  by Defendants do not show any disclosure to A&C of the fact that there was no agreement as to
24  the terms of the Novalk Amendement as of November 30 or even as late as December 5, 2016,
25  well after the close of FY16. Because "defendants withheld material information from their
26  accountants, defendants will not be able to rely on their accountant's advice as proof of good
27  faith." *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996).

28      Defendants cite *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010) and *In*

26

1  *re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446 (N.D. Cal. 1996), but those cases only highlight

2  why A&C's audit does not negate scienter for Defendants' misstatement regarding the gain on

3  the Novalk Amendment. In *Remec*, outside auditors specifically analyzed the allegedly misstated

4  metric, goodwill. 702 F. Supp. 2d at 1211-16 (background on goodwill), 1245-46 ("Ernst &

5  Young . . . expressly concurred in the conclusion that goodwill was not impaired."). In *Cirrus*,

6  defendants "offered evidence that they made extensive disclosure to, and voluntarily consulted

7  with, E & Y on all material accounting reserve decisions, in an effort to seek the accounting

8  firm's guidance and approval." 946 F. Supp. at 1463. Here, by contrast, there is no evidence that

9  A&C (1) was given information about when the Novalk Amendment was agreed to, (2) drew

10  independent conclusions about when the Amendment was agreed to, or (3) evaluated whether the

11  recognition of a gain from the Amendment in FY16 was appropriate given when the Amendment

12  was agreed to. SF 2. "Numerous courts specifically have held that a claim of 'good faith' or

13  reliance on professionals is not available when a defendant has withheld material information

14  from the professionals." *Yuen*, 2006 WL 1390828, at *40.

15      Defendants also argue that they relied on outside counsel, Mr. Katz, in drafting the Novalk

16  Amendment. Mot. 28. But Katz said he relied on Isaac and Yunis's representation regarding the

17  Effective Date. SF 3. Defendants ignore this and baldly assert, without any basis, that Mr. Katz

18  "confirmed the propriety of the September 15 date[.]" Mot. 28. There is no evidence that Mr.

19  Katz was asked to evaluate whether the gain from the Novalk Amendment could be recognized

20  in FY16, no evidence that he was given all the facts about the continued negotiations over the

21  potential amendment into December 2016, nor any evidence that he specifically gave advice that

22  the recognition of the gain in FY16 was permissible. "This claimed defense requires precision in

23  what defendants told their lawyers, what advice their lawyers gave about legality of specific

24  representations, and subsequent reliance on that specific advice blessing a particular

25  representation. Defendants simply have not made this showing." *SEC v. Apartments Am., LLC*,

26  No. SA CV 12-0754 DOC AN, 2014 WL 842819, at *7 (C.D. Cal. Mar. 3, 2014) (internal

27  citation omitted) (rejecting advice of counsel defense based on defendant's "vague" assertions).

28  To the contrary, Mr. Katz's deposition testimony indicates that, with the benefit of a complete

1  disclosure of the facts surrounding the Novalk Amendment, he would have advised that the

2  Effective Date was *not* September 15, 2016. SF 3.

3     **2.  Claim 2: Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) for**

4        **materially false and misleading statements in LIVE's 2016 Press Release**

5        **a.  The Press Release overstated EPS by 40%**

6     There is no genuine dispute that Isaac and Live made a materially misleading statement of

7  Live's EPS for FY16 in the Press Release. Defendants even concede that the figure was not

8  GAAP-compliant. Mot. 30 (acknowledging that, in contrast with the Press Release, "a GAAP-

9  compliant EPS figure was published in Live's 2016 10-K[.]").

10    Instead, Defendants claim that "the manner in which [the inflated EPS figure] was

11  calculated[] was fully disclosed in the press release[.]" Mot. 30. This is both inaccurate and

12  clever to a fault. The Press Release did not disclose that the $8.92 EPS figure announced in the

13  release's headline was calculated using a denominator of 2 million shares. MPSJF No. 60.

14  Instead, in a paragraph that was hidden under the heading "About Live Ventures Incorporated,"

15  the Press Release stated that Live's "common stock was reduced from approximately 2.8 million

16  to 2.0 million shares." *Id.* at No. 62. It did not disclose that this lower share count was used to

17  calculate EPS, that the use of the lower share count was not GAAP compliant, or that Live would

18  be filing a financial statement the very next day that calculated EPS based on the accurate (and

19  higher) share count and disclosed an accurate (and lower) EPS. Moreover, even this scant

20  disclosure was affirmatively false. ICG had not, as of the date of the Press Release, let alone as

21  of the close of FY16 (the period whose financial results the Press Release purported to report),

22  "exchanged all of their shares for a series of 'common equivalent' preferred stock." MPSJF No.

23  62.

24        **b.  The Press Release's overstatement was made with scienter**

25    Defendants try to excuse the misstatement as "a technical issue." Mot. 30. However, the

26  undisputed evidence shows that the intentional overstatement of EPS by over 40% was a

27  calculated effort to drive up Live's stock price. Isaac understood that lowering Live's

28  outstanding common share count would increase Live's EPS. Isaac and Live sought to maximize

1  the market impact of the EPS contained in the Press Release by announcing that the release

2  would reveal financials, by releasing it the day before the 10-K was filed, and by releasing it

3  before the market opened. With this timeline in place, Isaac then emailed Live's broker in

4  advance, instructing him to place limit orders to sell Live stock "in case it goes busurk[.]"

5  MPSJF Nos. 99, 101.

6      Defendants claim that they are entitled to a reliance on professionals defense because the

7  Press Release was reviewed by outside counsel and auditors A&C before issuance. Mot. 31-32.

8  The reality is that there is no record whatsoever of A&C being asked to review the Press Release,

9  no record of the disclosure to A&C of any drafts of the Press Release, and no record of A&C's

10  approval of the Press Release. SF 5,6. Moreover, with respect to the question of whether A&C

11  reviewed the press release, Isaac's invocation of his fifth amendment privilege warrants a

12  negative inference in the SEC's favor. SF 6. With nothing more than an unsubstantiated claim

13  that A&C "reviewed" Live's press releases, "Defendants simply have not made [the] showing"

14  required to invoke good faith reliance on professionals." *Apartments Am., LLC*, 2014 WL

15  842819, at *7 (internal citation omitted).

16      Defendants claim that outside counsel reviewed the Press Release. This review does not help

17  them. Defendants have failed to show that they made a complete disclosure to counsel regarding

18  the circumstances of the share lockup or that the Press Release reported EPS for FY16 using a

19  denominator based on the number common shares outstanding that would only come to pass long

20  after the close of FY16. To the contrary, Live's outside counsel testified that he understood that

21  share conversion had already occurred by the time of the Press Release, when it had not. ODS

22  Ex. 94 (Katz Tr.) at 65:14-66:8. Nor have they made any showing that they requested legal

23  advice regarding the propriety of reporting EPS for FY16 using a post-FY16 share count.

24  Finally, they have made no showing that they received advice that the Press Release's inflated

25  EPS was appropriate. Live's outside counsel simply assumed that the accounting determinations

26  were accurate. *Id.* at 64:13-65:11. Defendants have not demonstrated that they sought legal

27  advice in good faith regarding the Press Release's touting of an inflated EPS figure.

28

3. **Claim 3: Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) for 2016 scheme to defraud**

Next, there is no dispute Live and Isaac engaged in a scheme to defraud by falsely overstating LIVE's FY16 performance metrics and artificially boosting LIVE's share price. Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder make it unlawful for any person in connection with the purchase or sale of securities to employ any device, scheme or artifice to defraud, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 15 U.S.C. § 78j(b)(a) and (c); 17 C.F.R. § 240.10b-5. To be liable for a scheme to defraud under the Exchange Act, a defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom.*, *Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*, 552 U.S. 1162 (2008). A "scheme to defraud may well include later efforts to avoid detection of the fraud." *SEC v. Zera Fin. LLC*, No. SACV 23-01807-CJC (ADSX), 2023 WL 8269775, at *7 (C.D. Cal. Oct. 30, 2023) (quoting *SEC v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982)).

In December 2016, Isaac and Live knowingly disseminated false statements about the Company's financial performance in the Press Release and the FY16 10-K. The undisputed evidence shows they engaged in additional deceptive conduct. Isaac signed, on Live's behalf, a Novalk Amendment that he knew was backdated. MPSJFSF Nos. 11-14. Isaac also personally arranged and authorized Live's payment of $120,000 for a stock promotion campaign that touted the imminent announcement of Live's year-end financial results, which he had taken determined steps to inflate. MPSJF Nos. 84-90. Isaac then sent a management representation letter in order to mislead Live's auditors as to the true date of the Novalk Amendment. SF 1. Finally, Isaac, on behalf of Live, sent a misleading Letter to Stockholders, in which he falsely denied that Live used paid stock promoters. MPSJF Nos. 115-119. Each of these acts had the principal purpose and effect of advancing a false appearance of Live's success, and Defendants' efforts to capitalize on and conceal that illusion is beyond dispute.

1    Defendants' try to excuse their scheme by emphasizing that their effort to profit failed. Mot.

2    33-34. Tellingly, they do not deny the attempt to profit from the scheme, merely its success. The

3    fact that they failed to sell stock at the price they expected it to achieve does not let them off the

4    hook. "The SEC does not need to prove investor reliance, loss causation, or **damages** in an

5    action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities

6    Act." *SEC v. Schooler*, No. 3:12-CV-2164-GPC, 2015 WL 3491903, at *6 (S.D. Cal. June 3,

7    2015) (emphasis added), *aff'd*, 905 F.3d 1107 (9th Cir. 2018).[4]

8    Defendants also misconstrue the SEC's claim as being based on the hiring of a stock

9    promoter. Motion at 34. Isaac's engagement of ProTrader Elite is offered in conjunction with his

10    subsequent denials of having done so in Live's response to FINRA and in the Letter to

11    Stockholders as evidence of Isaac's scienter with respect to the entire FY16 scheme. Moreover,

12    unlike defendants in *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1275–76 (11th

13    Cir. 2016), Isaac specifically misled investors as to Live's use of stock promoters. Such a

14    misstatement is actionable. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145,

15    1181 (D. Or. 2015) ("After Galena chose to disclose a lengthy list of reasons why its stock price

16    might fluctuate, it needed to include in that list the alleged scheme that Galena was manipulating

17    the stock price with the help of [stock promoters].").

18    ### 4. Claim 4: Violation of Section 17(a)(2) of the Securities Act for materially and

19    ### false and misleading statements in 2016

20    Section 17(a)(2) of the Securities Act prohibits any person from obtaining money or property

21    "by means of any untrue statement of a material fact or any omission to state a material fact." 15

22    U.S.C. § 77q(a)(2).[5] It may be satisfied with a showing of negligence. *Aaron v. SEC*, 446 U.S.

23    680, 697 (1980). As detailed above, Isaac made materially false and misleading statements, and

24    omitted material information, in Live's 2016 Press Release that falsely stated LIVE's earnings

25    per share were $8.92, or 40% more than LIVE's audited earnings per share announced the next

26

27    ---
[4] Moreover, regardless of its success, the attempt to capitalize on their scheme to defraud goes to
Defendants' scienter.

28    [5] This claim is the only one which requires that the defendant obtained money or property in
connection with the untrue statement.

day in Live's Form 10-K.

In connection with that false Press Release, Isaac obtained money from the December 2016 sale of Live stock from a brokerage account he controlled, which realized gross proceeds of approximately $48,000. On December 28, 2016, the day the untrue Press Release was issued, Kingston sold shares of Live for approximately $48,000. SF 12,13. There is overwhelming circumstantial evidence that Isaac controlled Kingston's fidelity account. SF 8-12. Isaac received Kingston's mail. Isaac impersonated Yunis to change Kingston's Fidelity brokerage log in credentials, and IP data ties Kingston's trading to Isaac's residence.

Furthermore, it is beyond dispute that Isaac obtained the proceeds of Kingston's trading in shares of Live. In late 2017, nearly the entire cash balance in Kingston's brokerage account was transferred through Kingston and Novalk bank accounts to Isaac's personal bank account. SF 14. This was the first ever withdrawal from Kingston brokerage account. Isaac's receipt of money from the Kingston trades is bolstered by the negative inference arising from his refusal to answer questions about his receipt of these funds and assertion of the Fifth Amendment. ODS Ex. 91 (Isaac 5/14/2024 Depo. Tr.) at 202:16-208:3, 208:5-209:24. Even without the negative inference, "[t]he element of Section 17(a)(2) liability that the defendant 'obtain money . . . by means of' an untrue statement or omission of material fact, merely requires some causal relationship between the fraudulent statement or omission and the defendant's acquisition of money. A defendant may be liable even if he obtains money or property in a highly roundabout manner." *SEC v. Tolstedt*, 545 F. Supp. 3d 788, 795 (N.D. Cal. 2021) (cleaned up) (quoting *SEC v. Farmer*, No. 14-cv-2345, 2015 WL 5838867, at *8 (S.D. Tex. Oct. 7, 2015)).

### 5.   Claim 5: Violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act for 2016 scheme to defraud

Section 17(a)(1) of the Securities Act prohibits any person, in the offer or sale of any securities, from employing any device, scheme, or artifice to defraud, and Section 17(a)(3) of the Securities Act prohibits any person, in the offer or sale of any securities, from engaging in any transaction, practice, or course of business which operates, or would operate, as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a)(1) and (3). For the reasons set forth above that Isaac is

1  liable for a scheme to defraud under claim 3, there is no dispute that Isaac engaged in a scheme

2  to defraud by falsely overstating LIVE's FY16 performance metrics and artificially boosting

3  LIVE's share price in violation of Securities Act Sections 17(a)(1) and (a)(3).

4  **6.  Claim 6: Violations of Rule 13b2-2 of the Exchange Act for false statements to**

5  **accountants regarding Novalk Amendment**

6  Isaac knowingly made a materially false or misleading statement or omission to Live's

7  auditor in December 2016, when, as Live's CEO and CFO, he signed a management

8  representation letter to Live's outside accountants in connection with the audit of Live's FY16

9  financials. SF 1. Defendants challenge only one aspect of this claim: whether the representations

10  regarding the Novalk Amendment's effective date were misleading. Mot. 41. That challenge is

11  easily overcome. In that letter, Isaac represented to the auditors that the Novalk Amendment was

12  "effective September 15, 2016," even though he knew that the terms of the Amendment had not

13  been agreed upon until after the close of Live's fiscal year, and further knew that he had

14  engineered the "effective date" from September 30 to September 15 to increase the amount of

15  "other income" that Live recorded as a result of the transaction. Isaac knew that the management

16  representation letter was misleading, as Live and Novalk had not agreed to the terms of the

17  Novalk Amendment until well after FY16 closed, and those material facts were never disclosed

18  to A&C.

19  **7.  Claim 7: Aiding and abetting violations of Section 10(b) of the Exchange Act and**

20  **Rule 10b-5(b)**

21  Defendants challenge Johnson's liability based only on his supposed lack of knowledge of

22  Isaac and Live's violation, which they claim is required for the SEC to make its claim. Mot. 35.

23  However, over a decade ago, Congress changed the aiding and abetting standard in the Dodd-

24  Frank Act of 2010 to include recklessness in addition to actual knowledge. Dodd–Frank Wall

25  Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376, § 9290

26  (codified at 15 U.S.C. § 78t(e)) (adding the words "or recklessly" to Exchange Act Section

27  20(e)). Thus, to establish Johnson's liability for aiding and abetting Live and Isaac's violations,

28  the SEC must show actual knowledge *or reckless disregard* of the primary violation and his own

role in furthering it. *See SEC v. City of Victorville*, No. ED CV13-00776 JAK (DTBx), 2017 WL 11679413, at *46–47 (C.D. Cal. June 2, 2017) (emphasis added).

There is no genuine dispute that Johnson was at least reckless in not knowing, that Live had backdated the Novalk Amendment. "Reckless conduct is conduct that is 'highly unreasonable' and represents 'an extreme departure from the standards of ordinary care ... to the extent that the ... defendant must have been aware of it.'" *Hollinger*, 914 F.2d at 1570 (citation omitted). Johnson was personally emailed the "news" that Live and Novalk had supposedly reached an agreement to amend the Novalk Agreement on December 5, 2016 (MPSJF No. 15) and thus knew that the amendment was not agreed to on the purported Effective Date. Moreover, Johnson again personally received an email two weeks later showing that a key term of the Amendment, the Effective Date (and, with it, Live's gain) was changed, which made clear that there had been no agreement as of the Effective Date or as of the close of FY16. MPSJF No. 16. Despite this, Johnson went ahead and prepared Live's 10-K for FY16 recognizing the gain from the Amendment and a footnote that disclosed the purported Effective Date and omitted the facts that the agreement was not reached until months later. MPSJF Nos. 43-46. Preparing a 10-K that included an Effective Date of September 15, 2016, "[d]espite all of this information regarding the unreliability" of the Effective Date, "was at least reckless." *SEC v. Premier Holding Corp.*, No. CV 18-00813-CJC(KESx), 2019 WL 8167920, at *6 (C.D. Cal. Dec. 10, 2019) (granting summary judgment to SEC for aiding and abetting fraud based on reckless preparation of Form 10-K).

### C. Claims 8-10, for Defendants' 2017-18 conduct related to ApplianceSmart

#### 1. Claim 8: Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) for false statements in Live's Form 10-Q for Q1 2018

The record shows that Defendants Live, Isaac, and Johnson made materially false and misleading statements, and omitted material information, in Live's Form 10-Q for Q1 FY18 in which it recognized other income of $3,773,486 as a bargain purchase gain from the acquisition of ApplianceSmart. The Form 10-Q was false and misleading because Live did not have effective control of ApplianceSmart, the transaction had not closed, consideration had not

passed, and ApplianceSmart's stock had not been placed in escrow. The Form 10-Q omitted

material information that using December 30, 2017, as the acquisition date was not in accordance

with GAAP because LIVE did not have effective control of ApplianceSmart, and that the

MidCap Credit Agreement effectively prevented LIVE from gaining effective control of

ApplianceSmart. SF 23-25.

### a. Defendants misstated that Live gained effective control of ApplianceSmart in Q1 2018

To overcome this undisputed evidence, Defendants cite Johnson's self-serving statements for

the contention that "as of December 30, 2017 . . . Live's management had control of

ApplianceSmart's operations." Mot. 36. In reality, the evidence demonstrates that ARCA's CEO,

Tony Isaac, remained the CEO of ApplianceSmart until at least February 16, 2018. SF 34.

Crucially, Live did not even gain control of ApplianceSmart's revenue until March 2018. SF 25.

### b. Defendants acted with scienter

Isaac and Johnson knew the ApplianceSmart acquisition had not closed as of the end of Q1

2018, yet they represented to the public, in Live's 10-Q, that it had. They were motivated to do

so to recognize a substantial bargain purchase gain in a challenging quarter. Motive can provide

circumstantial evidence of scienter. SF 20, 21. *See In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d

903, 930-31 (N.D. Cal. 2020). It is also evident from Isaac and Johnson signing the 10-Q, which

falsely represented that the ApplianceSmart stock certificate had been "delivered into escrow,"

when they both knew or were reckless in not knowing that it was still held by MidCap as

collateral, meaning ARCA could not have delivered the certificate on or before December 31,

2017, let alone a certificate "free and clear of [the] Encumbrances imposed by the MidCap Credit

Agreement." SF 19. Finally, Isaac and Johnson's scienter is demonstrated by the fact that they

signed the false management representation letter stating the Live had effective control over

ApplianceSmart as of December 30, 2017. SF 31. They knew or were reckless in not knowing

that ApplianceSmart was controlled by ARCA's and ApplianceSmart's CEO Tony Isaac, and

that Live had not ability to control ApplianceSmart's revenue. Isaac is Tony Isaac's son, and

Johnson was CFO of both Live and ARCA. SF 16.

1

       **c.  Defendants did not rely on professional in good faith when representing that Live gained control in Q1 2018**

2

3       Contrary to Defendants' claim, they did not "make [a] full disclosure of all relevant

4  information" to "auditors, accountants, and attorneys." Mot. 37. In particular, Live withheld

5  material information concerning restrictions placed on ApplianceSmart under the MCA. Live did

6  not disclose the existence of the "lockbox" arrangement. SF 32. Live also failed to disclose to

7  Singer that the ApplianceSmart stock certificate – which ARCA was required to deliver to Live

8  at "Closing" under the Stock Purchase Agreement – was physically held by MidCap as collateral

9  under the MidCap Agreement until March 2018. SF 31. Instead, Live affirmatively

10  misrepresented that "[t]he shares of ApplianceSmart stock are in escrow." *Id*. However, on May

11  15, 2018 (more than three months after Live filed its Form 10-Q for 2018 Q1), Johnson sent

12  Singer a memo that acknowledged: "In section 3.01 Closing [the Stock Purchase Agreement]

13  mentions an escrow agent and an escrow. **Neither of these things took place.** The shares were

14  held by MidCap Financial (Seller's finance company) until March 22, 2018 at which time they

15  were released to the Seller and then given to the buyer." *Id*.

16       Moreover, Singer did not provide the advice Defendants now claim absolves them of

17  wrongdoing. Contrary to what Defendants suggest, Singer did <u>not</u> render an opinion as to

18  whether the ApplianceSmart acquisition date was, in fact, December 30, 2017. ODS Ex. 87

19  (Doran Inv. Tr.) at 143:17-24. In fact, although the motion liberally refers to Singer as Live's

20  auditor, Singer conducted some quarterly reviews but resigned before conducting an audit. SF

21  29. Though elided by Defendants, this distinction dooms a reliance on auditors defense. SF 30 (a

22  quarterly review is "less in scope than an audit" and entails only "limited procedures.").

23       Finally, Defendants cannot have relied in good faith on the work of Singer based on facts

24  they disclosed after their misstatement was made. Defendants cite a series of memos by Johnson

25  as providing Singer with "all facts and circumstances relating to Live's acquisition of

26  ApplianceSmart" (Mot. 18). Putting aside their accuracy, those memos were sent months <u>after</u>

27  Live filed its Form 10-Q for 2018 Q1. SF 31, 33-35. Good faith reliance on professionals

28  required that defendants seek advice <u>before</u> their illegal conduct. *See SEC v. Grybniak*, No. 20-

1    CV-327(EK)(MMH), 2024 WL 4287222, at *17 (E.D.N.Y. Sept. 24, 2024).

2        **2. Claim 9: Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and**

3        **10b-5(c) for scheme to create the false appearance that LIVE acquired**

4        **ApplianceSmart on December 30, 2017**

5        The SEC has shown that Defendants engaged in a scheme to defraud by creating the false

6    appearance that Live acquired ApplianceSmart on December 30, 2017, and that December 30,

7    2017, was the acquisition date for accounting purposes. The SEC has further shown that the

8    purpose and effect of the scheme was to enable Live to recognize $3,773,486 of other income

9    from a bargain purchase gain to improve performance metrics for the quarter.

10        The steps Defendants took in furtherance of their scheme are undisputed. Johnson created a

11    plan for Live and ARCA to claim that Live had made a cash payment of approximately

12    $2,580,505.54 to ARCA, which in fact were payments made by ApplianceSmart to MidCap

13    under the terms of the MidCap Credit Agreement, effectively concealing the fact that Live had

14    had no control over ApplianceSmart's revenue until March 2018. LIVE's January 5, 2018 Form

15    8-K falsely represented that the capital stock of ApplianceSmart had been delivered into escrow

16    when in fact it was subject to the MidCap Credit Agreement and in the possession of MidCap,

17    and that false statement was repeated in LIVE's Form 10-Q for the first quarter of it FY 2018.

18    LIVE's Form 10-Q for the first quarter repeatedly referred to December 30, 2017 as the "closing

19    date," although the transaction had not closed on that date. LIVE and JOI/ARCA each stated that

20    LIVE had paid $2,580,505.54 in cash to JOI/ARCA, when in fact LIVE had not made such a

21    cash payment, and this statement was repeated in JOI/ARCA's Form 10-K for its fiscal year

22    ending December 30, 2017; in LIVE's Form 8-K filed April 26, 2018; and in LIVE's Form 10-Q

23    for the second quarter of its FY 2018. The repeated misstatements about the stock being placed

24    into escrow, the $2,580,505.54 cash payment, the closing of the transaction, and LIVE's

25    effective control of ApplianceSmart were made to create the false appearance that LIVE had

26    acquired ApplianceSmart on December 30, 2017, which did not occur until the MidCap Credit

27    Agreement was terminated. "Those who disseminate false statements with intent to defraud are

28    primarily liable under Rules 10b–5(a) and (c) [and] § 10(b) [of the Exchange Act]." *Lorenzo v.*

1  *SEC*, 587 U.S. 71, 83 (2019).

2      To make matter worse, Isaac and Johnson both lied to Live's outside accountants concerning

3  Live's effective control of ApplianceSmart as part of the scheme. This had "the principal

4  purpose and effect of creating a false appearance of fact in the furtherance of a scheme to

5  defraud" by allowing the scheme to proceed and evade detection. *Simpson* 452 F.3d at 1050.

6          **3.  Claim 10: Violations of Rule 13b2-2 of the Exchange Act for false statements to**

7              **accountants regarding ApplianceSmart transaction**

8      It is undisputed that, Isaac and Johnson signed a management representation letter dated

9  February 14, 2018, to Live's outside accountants, Singer, which stated that LIVE had effective

10  control of ApplianceSmart as of December 30, 2017. This was a false statement of material fact.

11  Furthermore, the letter omitted key facts which would be material to a reasonable auditor in

12  determining the date of effective control. For example, Live did not disclose the existence of the

13  "lockbox" arrangement, which substantially restricted Live's usage of ApplianceSmart's

14  revenues well into Q2 2018. Singer's engagement partner testified that she would have wanted to

15  know that.

16      The letter also falsely stated that "[t]he shares of ApplianceSmart stock are in escrow," which

17  was not true. Such a misstatement is material to a reasonable accountant.

18      **D.  Other claims (11-17)**

19          **1.  Claim 11: Violation of Rule 13a-14 of the Exchange Act for false certifications of**

20              **LIVE's Form 10-K for FY16**

21      Defendants do not argue and thus concede that Isaac certified the accuracy of Live's Form

22  10-K for FY16, that he was aware of the contents thereof, and even that a misstatement was

23  contained therein. Instead, they argue only that there is "no evidence that . . . Isaac . . . provided

24  any false or misleading information to any of [Live's] accountants or auditors." Mot. 42.

25  However, as discussed extensively *supra*, Defendants did not make complete and accurate

26  disclosures to the accountants regarding the misstatements contained in the 10-K for FY16,

27  regarding the Effective Date of the Novalk Amendment.

28

## 2. Claim 12: Violation of Rule 13a-14 of the Exchange Act for false certification of LIVE's Form 10-Q for Q1 2018

Once again, Defendants do not argue and thus concede that Johnson certified the accuracy of Live's Form 10-Q for Q1 2018, that he was aware of the contents thereof, and even that a misstatement was contained therein. Instead, they argue only that there is "no evidence that . . . Mr. Johnson provided any false or misleading information to any of [Live's] accountants or auditors." Mot. 42. However, as discussed extensively *supra*, Defendants did not make complete and accurate disclosures to the accountants regarding the misstatements contained in the 10-K for FY16, regarding the date Live took effeouctive control of ApplianceSmart.

## 3. Claim 13: Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, for misleading filings

Section 13(a) and Rule 13a–1 require issuers of registered securities to file annual reports on Form 10–K and quarterly reports on form 10-Q. 15 U.S.C. § 78m(a), 17 C.F.R. §§ 240.13a–1 and 240.13a–13. Under Rule 12b–20, an issuer is further required to disclose any material information as may be necessary to ensure that the reports are not misleading. Rule 4-01(a)(1) of Regulation S-X requires that reports filed with the Commission pursuant to Section 13(a) of the Exchange Act be prepared in accordance with GAAP. 17 C.F.R. § 210.4-01(a)(1). Scienter is not required. *See, e.g., SEC v. Indigenous Glob. Dev. Corp.*, No. C-06-05600 JCS, 2008 WL 8853722, at *14 (N.D. Cal. June 30, 2008), *aff'd*, 402 F. App'x 250 (9th Cir. 2010).

Defendants do not argue that Live disclosed all material information necessary to ensure that the FY16 10-K and Q1 FY18 10-Q were not misleading. Mot. 41-42. Because Live recognized the gain from the Novalk Amendment in FY16, and because Live recognized the bargain purchase gain from the ApplianceSmart acquisition in Q1 FY18, these reports were not prepared in accordance with GAAP and did not contain disclosures to make them not misleading.

There is also no genuine dispute that Isaac and Johnson aided and abetted Live's violation of Section 13(a) and Rules 12b-20, 13a-1, and 13a-13. Isaac signed the misleading Form 10-K for 2016. He "undeniably played a major role" in these reporting violations as Live's CEO, and because he was the one who backdated the Novalk Amendment that formed the basis for the

1    wrongfully-recognized gain in the FY16 10-K. *Ponce v. S.E.C.*, 345 F.3d 722, 737 (9th Cir.

2    2003). Johnson, aided and abetted Live's violations of Section 13(a) and Rules 12b-20, 13a-1,

3    and 13a-13 by drafting a misleading disclosure regarding the Novalk Amendment in Live Form

4    10-K for FY16 and signing the misleading Q1 2018 10-Q. Like Isaac, Johnson knew, or was

5    reckless in not knowing, that the terms of the Novalk Amendment had not been agreed to until

6    well after the close of FY 16. With respect to ApplianceSmart, he knew or was reckless in not

7    knowing that the MidCap Credit Agreement was in effect on December 31, 2017, so that the

8    ApplianceSmart shares could not be transferred free of all liens and encumbrances.

9        **4.  Claim 14: Violations of Section 13(b)(2)(A) of the Exchange Act for Failure to**

10            **Maintain Accurate Books and Records**

11    Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records,

12    and accounts which in reasonable detail accurately and fairly reflect their transactions and the

13    dispositions of their assets. Like other reporting violations, no showing of scienter or materiality

14    is necessary to establish a violation of this provision. *SEC v. McNulty*, 137 F.3d 732, 740-41 (2d

15    Cir. 1998). It is enough that Live's FY16 10-K and Q1 FY18 10-Q contained misstatements. *See*

16    *U.S. v. Crop Growers Corp.*, 954 F. Supp. 335, 357 (D.D.C. 1997) (concluding that "financial

17    statements are books and records under the securities laws"); *SEC v. Black*, 2008 WL 4394891,

18    at *15 (N.D. Ill. Sept. 24, 2008) ("The misstatements contained in the Forms 10–K establish a

19    violation of § 13(b)(2)(A)'s recordkeeping requirement."). Once again, Isaac and Johnson aided

20    and abetted Live's violation of Section 13(b)(2)(A) by knowingly preparing the Live 10K for

21    FY16 and 10-Q for Q1 2018.

22        **5.  Claim 15: Violations of Section 13(b)(2)(B) of the Exchange Act for failure to**

23            **maintain a system of internal accounting controls**

24    Section 13(b)(2)(B) of the Exchange Act requires issuers to maintain a system of internal

25    accounting controls sufficient to provide reasonable assurances that transactions are recorded as

26    necessary to permit preparing of financial statements in conformity with generally accepted

27    accounting principles, or any other criteria applicable to such statements, and to maintain

28    accountability of assets. With no authority whatsoever, Defendants assert that violations of

Section 13(b)(2)(B) must be "knowing." Mot. 42. To the contrary, there is no knowledge or scienter required for direct liability under Section 12(b)(2)(B). *See Yuen*, 2006 WL 1390828, at *40 (citing *SEC v. World Wide Coin Inv., Ltd.*, 567 F.Supp. 724, 749 and 751 (N.D. Ga. 1983)). Live freely admits that its internal control over financial reporting was not effective as of the close of FY16, FY17, and FY19 (Motion at 20) and, though it doesn't admit as much in its Motion, the same was true in 2018. Thus, the Court should find Live liable. *See SEC v. e-Smart Techs., Inc.*, 82 F. Supp. 3d 97, 109 (D.D.C. 2015) ("Section 13(b)(2)(B) requires issuers to develop and maintain adequate internal controls over financial reporting.").

There is no genuine dispute that Isaac and Johnson knowingly or recklessly, and substantially, assisted these violations by their conduct with respect to the Novalk Amendment and ApplianceSmart transaction. As Live's CEO and CFO, respectively, they "bore special responsibilities with respect to the company's internal controls[,] . . . Yet [they] failed to adopt policies and procedures to ensure that transactions were appropriate and that improper or poorly documented transactions were quickly remedied." *Id.*, at 113. Accordingly, the Court should find them liable for aiding and abetting.

### 6. Claim 16: Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder for falsifying books and records

For these same reasons, the evidentiary record in this case supports a finding that Isaac and Johnson violated Section 13(b)(5) of the Exchange Act, which provides that no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls, or knowingly falsify any book, record or account of an issuer described in Section 13(b)(2) of the Exchange Act.

### 7. Claim 17: Violations of Section 14(a) of the Exchange Act and Rule 14a-3 Thereunder for soliciting proxies without furnishing required information

Rule 14a-3 requires disclosure of 'all' compensation 'awarded to, earned by, or paid to' a company's 'principal executive officer.' 17 C.F.R. § 229.402. Defendants admit that Live failed to disclose at least $54,000 for a housing reimbursement for Isaac in its 2016 Form 10-K. ECF No. 1 at 26–28; ECF No. 35 at 20. "Thus, [Live] cannot claim it disclosed all of Isaac's

compensation. *See* 17 C.F.R. § 229.402. On that ground alone, the SEC has sufficiently [shown] its seventeenth claim. Whether the compensation is actual or accrued is irrelevant; LVI had a duty to disclose all compensation, which the SEC alleges it did not. The LVI defendants' motion to dismiss is denied as to the seventeenth claim." *SEC v. Live Ventures Incorporated*, No. 2:21-cv-01433-JCM-MDC, 2022 WL 17253784, at *5 (D. Nev. Nov. 28, 2022). Defendants claim the omission was immaterial (Motion at 44), but the disclosure requirement under Rule 14a-3 does not turn on the materiality of the information in question. *Compare* Rule 14a-9 (17 C.F.R. § 240.14a–9).

## V.    CONCLUSION

For all the foregoing reasons, this Court should enter an order denying Defendants' motion, granting the SEC's motion for partial summary judgment.

Dated:  December 4, 2024                    Respectfully submitted,

                                            */s/ Daniel O. Blau*
                                            _____
                                            Ruth Pinkel
                                            Robert Stillwell
                                            Daniel O. Blau
                                            Attorneys for Plaintiff
                                            Securities and Exchange Commission

1

**<u>PROOF OF SERVICE</u>**

2

I am over the age of 18 years and not a party to this action. My business address is:

3

    U.S. SECURITIES AND EXCHANGE SEC,
    444 S. Flower Street, Suite 900, Los Angeles, California 90071

4

    Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

5

On December 4, 2024, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 172)** on all the parties to this action addressed as stated on the attached service list:

6

7

8

☐    **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

9

10

☐    **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

11

12

☐    **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

13

14

☐    **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

15

16

☐    **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

17

18

☐    **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

19

20

☒    **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

21

☐    **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

22

23

    I declare under penalty of perjury that the foregoing is true and correct.

24

Date:   December 4, 2024                 */s/ Daniel O. Blau*
                                            Daniel O. Blau

25

26

27

28

1

***SEC v. Live Ventures Incorporated, et al.***
**United States District Court – District of Nevada**
**Case No. 2:21-cv-01433-JCM-MDC**

2

3

SERVICE LIST

4

Daniel J. Wadley (*pro hac vice*) (served via CM/ECF)
Nicholas P. Peterson (*pro hac vice*) (served via CM/ECF)

5

Greenberg Traurig, LLP
222 S. Main Street, Suite 1730

6

Salt Lake City, UT 84101
wadleyd@gtlaw.com

7

nick.peterson@gtlaw.com
*Attorneys for Defendants John Isaac a/k/a Jon Isaac, Live Ventures Incorporated, and*

8

*Virland Johnson*

9

Mark E. Ferrario (NV Bar #1625) (served via CM/ECF)
Christopher R. Miltenberger (served via CM/ECF)

10

Kyle A. Ewing (served via CM/ECF)
Greenberg Traurig, LLP

11

10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135

12

ferrariom@gtlaw.com
miltenbergerc@gtlaw.com

13

ewingk@gtlaw.com
*Attorneys for Defendants John Isaac a/k/a Jon Isaac, Live Ventures Incorporated, and*

14

*Virland Johnson*

15

16

17

18

19

20

21

22

23

24

25

26

27

28