1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7
8
9
10
11
12

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff(s),

v.

LIVE VENTURES INCORPORATED, et al.,

Defendant(s).

Case No. 2:21-CV-1433 JCM (MDC)

ORDER

13
14
15
16
17

Presently before the court is John Isaac ("Isaac"), Virland Johnson ("Johnson"), and Live Ventures Incorporated ("Live") (collectively "defendants")'s motion for summary judgment. (ECF No. 172). The Securities and Exchange Commission ("SEC") filed a response (ECF No. 183), to which defendants replied (ECF No. 187).

18
19

Also before the court is the SEC's motion for partial summary judgment. (ECF No. 173). Defendants filed a response (ECF No. 181), to which the SEC replied (ECF No. 186).

20
21
22

As a preliminary matter, the court has sufficient information to decide the instant motion based on the filings and thus denies any request for oral argument. LR 78-1.

23

**I.    Background**

24
25
26
27

On September 22, 2025, the court denied several evidentiary challenges raised by defendants. (ECF No. 193). Those challenges focused on the scope of evidence the court could consider in resolving the parties' cross-motions for summary judgment. The court now turns to

28

**James C. Mahan**
**U.S. District Judge**

those motions. Because the factual record in this case is extensive and complex, the court addresses the relevant facts as necessary throughout this order.

## II. Legal Standard

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Information may be considered at the summary judgment stage if it would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In considering evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

When the non-moving party bears the burden of proof at trial, the moving party can meet its burden on summary judgment in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

1    If the moving party satisfies its initial burden, the burden then shifts to the opposing party
2
3    to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith*
4    *Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the
5    opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient
6    that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
7    versions of the truth at trial."  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.
8
9        However, the nonmoving party cannot avoid summary judgment by relying solely on
10   conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040,
11   1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the
12   pleadings and set forth specific facts by producing competent evidence that shows a genuine issue
13   for trial.  *See Celotex*, 477 U.S. at 324.  If the nonmoving party's evidence is merely colorable or
14   is not significantly probative, summary judgment may be granted.  *Anderson v. Liberty Lobby,*
15   *Inc.*, 477 U.S. 242, 249–50 (1986).
16
17   **III.    Request for Adverse Inference**
18       The SEC requests an adverse inference against Isaac because he asserted his Fifth
19   Amendment right against self-incrimination during his deposition.  In civil actions, the "Fifth
20   Amendment does not forbid fact finders from drawing adverse inferences against a party who
21   refuses to testify."  *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (quoting *United States v.*
22   *Solano-Godines*, 120 F.3d 957, 962 (9th Cir. 1997)).  The district court also has discretion in
23   responding to a defendant invoking the Fifth Amendment.  *Id.*
24
25       At this stage, the court declines to grant any adverse inference for the SEC.  The facts for
26   which the SEC requests an adverse inference are covered in other evidence such that the court may
27   appropriately consider the summary judgment motions.  To draw an adverse inference against
28

**James C. Mahan**
**U.S. District Judge**

- 3 -

1  defendant's invocation of his Fifth Amendment right during his deposition is therefore prejudicial

2  and premature in this case.  *See T.R. v. Howard*, No. 20-276 GBW/JHR, 2024 U.S. Dist. LEXIS

3  40587, at *7–8 (D.N.M. Mar. 3, 2024) (citing *Baxter v. Palmgiano*, 425 U.S. 308, 318 (1976)).

4  However, if defendant Isaac invokes his Fifth Amendment privilege at trial, the SEC may raise the

5  issue again.

6  **IV.    The Novalk Amendment**

7        The court first addresses the claims arising out of the Novalk Amendment.  Plaintiff alleges

8  violations of Section 10(b) of the Exchange Act and Rule 10-5(a)-(c) promulgated thereunder,

9  Sections 17(a)(1)-(3) of the Securities Act, Rule 13b2-2 of the Exchange Act, and one count of

10  aiding and abetting for the 10-b violations under 15 U.S.C. § 78t(e).

11        A.    Underline Background

12            1.    *The Novalk Amendment*

13        On October 2014, Live and Novalk Apps S.A.S. ("Novalk") entered into an asset purchase

14  agreement, whereby Live agreed to purchase software from Novalk in exchange for either

15  $1,500,000 or 800,000 shares of stock in Live.  (ECF No. 173, Ex. 17 at 4–5); (ECF No. 172 ¶ 4).

16        Live's 2016 fiscal year ended on September 30, 2016.  (ECF No. 173, Ex. 38 at 1).  Two

17  months later, on November 30, 2016, Live's CEO and CFO Jon Isaac emailed Juan Yunis, the

18  CEO of Novalk, telling him that Live wanted to "cancel the deal" because he did not believe that

19  they would use the software.  (ECF No. 173, Ex. 11 at 2).  It is unclear whether Novalk and Live

20  had previously mentioned restructuring the deal.  However, at his deposition, Yunis testified that

21  he understood the November 30, 2016, email to be the "start[] of discuss[ions] again about it."

22  (ECF No. 173, Ex. 50 at 128:4–17).

23            . . .

**James C. Mahan**
**U.S. District Judge**

- 4 -

The parties do not dispute that Novalk and Live amended the agreement such that the new purchase price was 350,000 shares of Live stock—less than half of the original purchase price (the "Novalk Amendment").  (ECF No. 173 ¶ 15); (ECF No. 181 ¶ 15).  The issue, however, arises with the purported "effective date" of the amendment.  (*See* ECF No. 173 ¶ 15); (ECF No. 181 ¶ 15).

Defendants claim that Yunis and Isaac reached an agreement to modify the agreement on September 15, 2016, but did not distill it into writing.  (ECF No. 172 at 4).  They cite only to the amendment as evidence.

When confronted with Isaac's request to cancel the deal, Yunis stated that "we already have a deal, we agreed to it last year."  (ECF No. 172, Ex. 232).  There is no reference to a September 2016 modification.

On December 5, 2016, Isaac emailed Virland Johnson, who was a consultant for Live at the time, quoting the shares at a stock price of $1.91 per share and citing a "9/30 closing date." (ECF No. 173, Ex. 14); (ECF No. 76 ¶ 12).  This conflicts with the amendment and a later email, which cite the closing date as September 15, when the stock was $1.67 per share.  (ECF No. 173, Ex. 15 at 2; Ex. 31).  Moreover, although the signature line in the amendment cites December 7, 2016, the recitals in the amendment state that Live and Novalk agreed to the terms on September 15, 2016.  (ECF No. 173, Ex. 15 at 2–3).

The SEC claims that the September 15, 2016 "effective date" was more beneficial to Live than the September 30, 2016, date mentioned in Isaac's first email.  (ECF No. 173 at 13).  Because of the purported "effective date" of the amendment, Live realized $915,500 in "other income," which is $84,000 more than it would have been under the stock price on September 30, 2016.  (*Id.* at 6); (ECF No. 172 ¶ 11).

2.    *Live's 2016 Form 10-K*

Johnson prepared Live's Form 10-K for fiscal year ("FY") 2016, which Isaac reviewed and approved.  (ECF No. 173, Ex. 38 at 23–25); (ECF No. 173, Ex. 46 at 4:13–22; 5:10–13); (ECF No. 172, Ex. 556 at 2).  Although Johnson was aware that the amendment was agreed upon in December, he relied upon the Novalk Amendment's September 15, 2016 "effective date," when drafting the 10-K.  (ECF No. 173 at 9).  Isacc signed a certification stating that, based on his knowledge, the 10-K did not contain any untrue statements of material fact and that fairly presented Live's financial condition.  (ECF No. 173 at 15; Ex. 38 at 23–25).

Because Live understood the closing date to be September 15, 2016, the company recognized the gain from the Novalk Amendment in FY 2016.  (*See* ECF No. 173, Ex. 47 at 47:13–24); (ECF No. 172 ¶¶ 13, 14, 16, 23).

In its form 10-K for FY 2016, Live stated that it had pre-tax income of $560,830,830, of which $915,500 was income from the Novalk Amendment.  (ECF No. 173, Ex. 38 at 6).  If Live had not recognized the Novalk deal in FY 2016, its pre-tax income would have been $4,545,330.  (ECF No. 173 at 14).

3.    *A&C's Audit*

Anton & Chia ("A&C") was Live's auditor for FY 2016.  Live claims that it provided A&C with a copy of the Amendment, and specifically pointed out that the "effective date is September 15th…but the signature date is now."  (ECF No. 172 ¶ 19).

On December 28, 2016, Isaac signed a management representation letter directed to A&C, stating: "On December 7, 2016, [Live] and Novalk memorialized an agreement which is effective September 15, 2016[,] that changes the terms and conditions relating to payment of the outstanding software license fee of $1,500,000…As a result of the agreement, [Live] recorded $915,000 of

other income in September 2016…" (ECF No. 173, Ex. 3 at 3–5); (ECF No. 172 ¶ 20). After conducting an audit, A&C concluded that "additional adjustment of $915K [was] required to record settlement of debt with Novalk," after which final other income balance was "fairly stated." (ECF No. 172, Ex. 557 at 6).

### 4. Share Lock-up

On December 27, 2016, Isaac Capital Group ("ICG"), a company owned by defendant Isaac, entered into an agreement with Live in which ICG agreed to sell its share of Live common stock for shares of Series B common stock. (ECF No. 173, Ex. 30 at 2, 3). Effectively, Isaac (through ICG) agreed to lock up his shares in Live until after December 31, 2021. (ECF No. 173, Ex. 2); (ECF No. 172 ¶ 27). The transaction was completed in January 2017. (ECF No. 173, Ex. 19).

### 5. Stock Promotion, December 2016 Press Release, and Share Price Spike

Live hired Pro Trader Elite LLC to promote Live's stock in advance of an upcoming press release publication. (ECF No. 173 ¶¶ 85, 87, 88, 90). In later communications with FINRA and to stockholders, Isaac denied that he or Live paid for promotional activity related to the company. (*Id.* at 16–17, 23). (*See also* ECF No. 181 ¶¶ 84, 112).

Live issued the press release on December 28, 2016, announcing its financial results for FY 2016. (ECF No. 173, Ex. 1 at 1). In the headline and within the body of the release, Live report its earnings per share ("EPS") as $8.92 per share. (*Id.*).

The SEC takes issue with the figure in several respects. The figure incorporates the gain from the Novalk Amendment, which the SEC claims was reported in the wrong fiscal year. (ECF No. 173 ¶ 53). It was also not compliant with generally accepted accounting principles ("GAAP") and did not match the $6.33 EPS reported in its 10-K the next day. (ECF No. 173, Ex. 38 at 6).

James C. Mahan
U.S. District Judge

- 7 -

1    Defendants Live and Isaac calculated the $8.92 EPS by dividing Live's earnings by 2 million

2    shares due to Isaac's pending share lockup.  (ECF No. 181 ¶ 61).  The SEC claims, and Johnson

3    admitted, that this was the wrong divisor since the share lockup had not yet occurred.  (ECF No.

4    173, Ex. 46 at 8:19–25, 9:1–24).  Finally, the press release states that financial results were filed

5    "today," when the 10-K was not filed until the next day (ECF No. 173, Ex. 1 at 1).

6

7        On December 27, 2016, Live's stock price closed at $26.09.  (*Id.* at 14).  The day that Live

8    issued the 2016 press release, its share price reached $35.80 in pre-market trading, opened at

9    $31.32, and reached a high of $32.98.  (*Id.*).

10

        B.    Discussion

11

12            1.    *Claims One and Two: Section 10(b) of the Exchange Act and Rule 10b-*

13                  *5(b) (as to Live and Isaac).*

14        Pursuant to Section 10(b) of the Securities Exchange Act, it is unlawful for any person to

15    employ "any manipulative or deceptive device or contrivance in contravention of such rules and

16    regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  As the Ninth Circuit explained

17    in *SEC v. Platform Wireless International Corporation*,

18

19            Rule 10b-5, promulgated under Section 10(b), makes it unlawful, in connection
            with the purchase or sale of a security, to 'make any untrue statement of a material
20          fact or to omit to state a material fact necessary in order to make the statements
            made, in the light of the circumstances under which they were made, not
21          misleading.'

22

23

24    617 F.3d 1072, 1092 (9th Cir. 2010) (quoting 17 C.F.R. § 240.10b-5(b)).

25        Liability under Section 10(b) and Rule 10b-5 requires evidence of (1) a material

26    misrepresentation, (2) in connection with the purchase or sale of a security, (3) with scienter, (4)

27    by means of interstate commerce.  *SEC v. Glt. Dain Rauscher, Inc.*, 254 F.3d 852, 855–56 (9th

28    Cir. 2001) (citing *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993)).  For a

James C. Mahan
U.S. District Judge

- 8 -

misrepresentation to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988) (citation and internal quotation marks omitted).

Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). Reckless conduct may also constitute scienter. *Dain Rauscher, Inc.,* 254 F.3d at 856. Reckless conduct is a highly unreasonable act or omission that is an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation and internal quotation marks omitted).

### i.      Gain on Novalk Amendment (Live's 10-K)

The SEC claims that Isaac and Live violated Section 10(b) and Rule 10b-5(b) by making materially false and misleading statements as to the gain Live made from the Novalk agreement. The parties dispute the elements of materiality and scienter. Key to each of their arguments on these elements is what they believe the "effective date" of the Novalk Amendment to be.

Particularly, the SEC believes that Live and Novalk agreed on the amendment after the end of FY 2016. Live, on the other hand, argues they had an agreement on September 15, 2016, but had simply not formalized it yet. A reasonable jury could find for either party—that the date was properly situated in FY 2016, or that it should have been set within FY 2017.

Live also claims that it relied in good faith on professionals, thereby negating the scienter element. The Ninth Circuit indicated this defense could be available; however, no case law directly supports such a defense. *See S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985). Still, even assuming the defense of good faith reliance on accounting professionals

is available in this circuit, it is unclear whether defendants satisfy its requirements or what effect it would ultimately have. *See in re Diamond Foods, Inc., Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) ("A clean audit opinion may possibly support the conclusion that defendants did not act with scienter, but it is not dispositive.").

Senior management employees within companies "have an independent duty to ensure compliance with GAAP and maintain effective internal controls," that cannot be delegated to outside accountants. *Id.* "If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." *Goldfield,* 758 F.2d at 467 (quoting *United States v. Erickson,* 601 F.2d 296, 305 (7th Cir. 1979), *cert. denied,* 444 U.S. 979 (1979)).

The SEC argues that the accountants were misled, and that critical information was withheld or obscured by defendants. This calls into question whether the audit could be considered unqualified or clean in the first place. *Cf. New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (finding accounting firm failed to investigate company by accepting management at its word, not receiving requested documentation, and issuing an unqualified opinion on the accuracy of inaccurate financial statements).

Accordingly, the court declines to apply the defense of reliance on accounting professionals at the summary judgment stage.

Because there is a genuine dispute of material fact as to the "effective date" of the amendment, which is central to the parties' Section 10(b) and Rule 10b-5(b) arguments here, and as to scienter, the court DENIES summary judgment in favor of either party.

. . .

James C. Mahan
U.S. District Judge

- 10 -

1

2

3    ii.    **Press Release**

4    The SEC also claims that Isaac and Live violated Section 10(b) and Rule 10b-5(b) by

5    making materially false and misleading statements of Live's earnings per share for FY 2016 in its

6    December 2016 press release.  The parties dispute whether there was a material misrepresentation

7    and whether the defendants had the requisite scienter.

8    First, the SEC claims that the press release made material misrepresentations to investors

9    by overstating the EPS figure by 40 percent and by recognizing the gain from the Novalk

10   Amendment as part of Live's FY 2016 earnings.  The latter argument requires one to accept the

11   premise that the Novalk Amendment should not have been recognized in the FY 2016 earnings.

12   As mentioned above, a reasonable jury could find that the Novalk Amendment was properly

13   recorded in FY 2016, and thus appropriately recognized and stated in the press release.

14   There is no genuine dispute that the $8.92 EPS figure advertised in the 2016 press release

15   was an untrue statement.  Defendants claim that the figure was not false because it was calculated

16   based on defendant Isaac's share lock-up, which he had purportedly "bound himself" to before the

17   release.  (ECF No. 172 at 30).  Yet, this contradicts the fact that Live filed a lower, GAAP-

18   compliant $6.33 EPS figure in its 10-K the next day.  (ECF No. 173, Ex. 38 at 6).  Even Live's

19   consultant admitted in his deposition testimony that he recognized that the $8.92 figure was

20   incorrect.  (ECF No. 173, Ex. 48 at 43:10–17; 44:9–12, 25; 45:1–5).

21   The issue is whether the advertisement of the $8.92 EPS figure, in the context of the press

22   release, constituted a material misrepresentation.  This is a fact-based inquiry, to be viewed through

23   the lens of a "reasonable investor."  *See Levinson*, 485 U.S. at 231–32 (citation and internal

24   quotation marks omitted).  The finders of fact, not this court, are best suited to determine whether

25   the disclosure of the correct information will alter the "total mix" of information available.  *See id.*

James C. Mahan
U.S. District Judge

- 11 -

Second, the SEC alleges that Isaac acted with scienter in causing Live to publish the 2016 press release. The SEC claims that Isaac, as CEO and CFO of Live, "deliberately caused Live to issue" a press release that he knew advertised inflated earnings per share. (ECF No. 173 at 28); *see, e.g.*, *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) (en banc) (holding respondeat superior to be a basis for vicarious liability in securities cases); *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (scienter of controlling officers may be imputed to corporation).

The evidence does not clearly favor the position that Isaac made an "extreme departure from the ordinary standard of care." *See Dain Rauscher, Inc.*, 254 F.3d at 856. Albeit misguided, a reasonable jury could find that Isaac was "trying to be more prospective in his disclosure"—as a businessman might. (ECF No. 173, Ex. 48 at 44:2–8) (error in original).

There is evidence that Isaac emailed Live's broker between the publication of the press release and the filing of the 10-K, instructing him to place limit orders to sell Live stock "in case it goes busurk [sic]." (ECF No. 173, Ex. 10) (error in original). This does not, per se, mean that Isaac's or Live's actions were out of the ordinary, as a reasonable person would expect "good news" (true or untrue) to have a positive impact on stock value.

The SEC also claims that the filing of the 10-K the day after the press release is evidence of a culpable mental state, while defendants allege that, if anything, it shows they took immediate, necessary corrective action when filing with the SEC.[1] (ECF No. 172 at 36–38); (ECF No. 183 at 28–29). Either position is reasonable and for the jury to decide.

---

[1] Defendants raise the professional defense argument; as discussed above, the court will not consider at this time. *See supra* section B.1.i.

There is a genuine dispute as to whether Isaac, and by extension Live, acted with the requisite scienter. *See Dain Rauscher, Inc.*, 254 F.3d at 856. Accordingly, the court DENIES summary judgment on claim 2.

2. *Claim 3: Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) (as to Live and Isaac)*

Rule 10b-5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person…in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. "The scope of § 10(b) includes deceptive conduct in furtherance of a 'scheme to defraud,' when all elements of § 10(b) are otherwise satisfied." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1043 (9th Cir. 2006), *vacated on other grounds sub nom.*, *Avis Budget Group Inc., v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008). To be liable for a "scheme to defraud," "each defendant [must have] committed a manipulative or deceptive act in furtherance of the scheme." *Id.* at 1048.

SEC claims that Isaac and Live knowingly disseminated false statements about Live's financial performance for FY 2016 via the press release and by recognizing the Novalk Amendment in its "other income" for 2016. (ECF No. 183 at 30) It also contends that Isaac sent "false and misleading" communications to Live's auditors and to its stockholders in an attempt and with the effect of "advancing a false appearance of Live's success." (*Id.*).

To the extent that these arguments rely on the contention that the Novalk Amendment was backdated, they will not be considered. *See supra* Section B.1.i.

. . .

. . .

. . .

As previously discussed, the parties dispute Live and Isaac's mental state in publishing the release.[2]  Relatedly, there is a genuine issue of material fact as to whether Isaac sent the letter to stockholders denying that Live paid stock promoters with the principal purpose of advancing a false appearance of Live's success, considering it was sent after the press release and filing of the 2016 10-K, and that Isaac denies it was wrong to hire the promoters or that he intended to defraud the stockholders in the first place.

Accordingly, the court DENIES summary judgment on this claim.

3.     *Claim 4: Section 17(a)(2) of the Securities Act (against Isaac)*

Under Section 17(a)(2) of the Securities Act, persons are prohibited from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact."  There is no scienter requirement.  *See Aaron v. SEC*, 446 U.S. 680, 697 (1980).  Only the defendants move for summary judgment on this claim.

The crux of the issue here is whether defendant Isaac obtained money or property by causing Live to publish the 2016 press release containing the incorrectly calculated EPS figure.

Merriam-Webster defines "obtain" as "to gain or attain usually by planned action or effort."[3]  Neither Issac nor ICG directly obtained money through sell orders.  There were, however, several sales of Live shares executed by a company called Kingston during the December 28th share price spike, from which the SEC contends Isaac profited.  (ECF No. 172 at 33; ECF No. 77 ¶ 77; ECF No. 183 ¶ 13).

. . .

---

[2] Defendants again raise the argument that they relied on professionals (here, counsel and outside auditors) that reviewed the 2016 press release before it was published.  For the reasons discussed in *supra* Section B.1.i, the court will not consider the argument at this time.

[3] *Obtain*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/obtain (last visited January 29, 2025).

1    However, there is a genuine issue of fact as to whether Isaac obtained money or property

2  *indirectly*, via Kingston.  On the papers, defendant Isaac does not own Kingston and did not

3  execute the sale orders—Kingston's owner Juan Yunis placed the orders to sell.  (ECF No. 172,

4  Ex. E at 512:22–513:3); (ECF No. 172, Ex. A at 151:19–153:6).  There is a dispute over the extent

5  to which Isaac controls Kingston.

6

7    Approximately a year after the spike in Live's share price, Kingston wired nearly its entire

8  cash balance from its brokerage account to Novalk, which proceeded to wire the funds to Isaac's

9  personal bank account.  (ECF No. 183 ¶ 14).  The parties do not dispute that the transfer was part

10  of a $742,000 loan from Yunis to purchase real property.  (ECF No. 183, Ex. 90 at 405:19–409:25;

11  Ex. 98 at 164:2–18).  The loan has purportedly "been repaid in full, including interest."  (ECF No.

12  184, Ex. D at ¶ 9).

13

14    Although attenuated, a reasonable juror could find Isaac obtained real property by means

15  of causing Live to publish the untrue inflated EPS figure.  *See SEC v. Tolstedt*, 545 F. Supp. 3d

16  788, 795 (N.D. Cal. 2021) (quoting *SEC v. Farmer*, No. 14-cv-2345, 2015 WL 5838867, at *8

17  (S.D. Tex. Oct. 7, 2015) ("A defendant may be liable even 'if he obtains money or property in a

18  highly roundabout manner.'").  Accordingly, summary judgment is DENIED on claim 4.

19

20    *4.    Claim 5: Section 17(a)(1) and (a)(3) of the Securities Act (as to Isaac)*

21    Section 17(a)(1) of the Securities Act, makes it unlawful to "employ any device, scheme

22  or artifice to defraud."  Section 17(a)(3) makes it unlawful for any person "to engage in any

23  transaction, practice, or course of business which operates or would operate as a fraud or deceit."

24

25    Like Section 10b-5(c) of the Exchange Act, Section 17(a)(1) has a scienter requirement.

26  *Aaron*, 446 U.S. at 697.  The SEC raises the same scienter arguments here as it does under its

27

28

James C. Mahan
U.S. District Judge

Section 10b-5(c) claim, which have been denied. *See supra* Section B.2. Thus, the court denies summary judgment as to Section 17(a)(1).

Section 17(a)(3) presents a different case. It focuses on the effect of the defendants' conduct on members of the investing public, rather than their culpability. *Aaron*, 446 U.S. at 697. Accordingly, it only requires a showing of negligence. *Id.*; *Dain Rauscher, Inc.*, 254 F.3d at 856. There is scant discussion in the briefings over the effect of defendants' alleged conduct on the investing public. The court cannot, therefore, grant summary judgment in favor of either party as to Section 17(a)(3).

Summary judgment is DENIED on claim 5 in its entirety.

> 5. *Claim 6: 13b2-2 of the Exchange Act (as to Isaac); and Claim 7 Aiding and Abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) (as to Johnson)*

Defendants move for summary judgment on the SEC's claim against Isaac under Section 13b2-2 of the Exchange Act. Both parties move for summary judgment on the SEC's claim that Johnson aided and abetted the alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5(b). Summary judgment on these claims is DENIED, as the parties' arguments rely on the effective date of the Novalk Amendment, which this court has determined is a triable issue for the jury.

## V.    The ApplianceSmart Transaction

The court will now address the claims arising out of the ApplianceSmart transaction. The SEC alleges violations of Section 10(b) of the Exchange Act and Rule 10-5(a)-(c) promulgated thereunder, and Rule 13b2-2 of the Exchange Act.

. . .

<u>A.</u>     <u>Background</u>

     *1.*     *The ApplianceSmart Transaction*

On January 5, 2018, Live filed a Form 8-K with the SEC in which Live disclosed that ApplianceSmart Holdings LLC ("ASH"), a wholly owned subsidiary of Live, had entered into a Stock Purchase Agreement ("SPA") with Appliance Recycling Centers of America, Inc. ("ARCA") on December 30, 2017, for the purchase of ARCA subsidiary ApplianceSmart. (ECF No. 183, Ex. 76 at 2 ); (*see also* ECF No. 172, Ex. 92). At the time, Johnson was the CFO of both Live and ARCA. (ECF No. 183, Ex. 92 at 108:21–109:1).

According to Live's Form 8-K, ASH agreed to purchase "all of the issued and outstanding shares of capital stock" of ApplianceSmart for a purchase price of $6.5 million. (ECF No. 183, Ex. 76). The filing further stated that the shares of ApplianceSmart were delivered into escrow and would be released upon payment of the purchase price. (*Id.*).

In addition to the SPA, Live—through its subsidiary, ASH—and ARCA entered into a Transition Services Agreement ("TSA") on December 30, 2017. (ECF No. 172, Ex. H). Under the TSA, ARCA agreed to continue to provide certain services to ApplianceSmart employees as it was transferred to Live. (*Id.*).

On February 14, 2018, Live filed its Form 10-Q for Q1 of Live's fiscal year 2018 ("FY18"), which ended on December 31, 2017. (ECF No. 183, Ex. 79). Isaac signed and certified the filing as Live's CEO and principal executive officer; Johnson signed and certified the filing as Live's CFO and principal financial officer. (*Id.*). The Form 10-Q lists December 30, 2017, as the ApplianceSmart closing date. (*Id.*). The form also states that the shares of ApplianceSmart were delivered into escrow and would be released upon the receipt of "third-party financing in an amount sufficient to fund the Purchase Price, and the subsequent delivery of such funds to certain

third-party lenders of ARCA and ApplianceSmart, all of which the parties expect to occur prior to March 31, 2018." (*Id.* at 11).

According to a preliminary purchase price allocation set forth in Live's Form 10-Q for FY18 Q1, the value of the assets that Live had acquired in connection with the ApplianceSmart transaction was $3,773,486 greater than the purchase price of $6,500,000. (*Id.* at 9). The SEC states that by recording $3,773,486 in other income in FY18 Q1, Live increased its pre-tax income from $1,529,560 to $5,303,046. (ECF No. 183 at 7–8).

### 2.    The MidCap Credit Agreement

The SEC argues that because of a credit agreement with a third party, ApplianceSmart could not be sold in FY18 Q1 and that Live did not exercise control over ApplianceSmart on December 30, 2017.

At the time Live and ARCA entered the SPA, ARCA and its subsidiaries—including ApplianceSmart—were parties to a Credit and Security Agreement dated May 10, 2017, with MidCap Financial Trust ("MidCap") as the lender. (ECF No. 172, Ex. 92 at 7). The SPA defined this agreement as the "MidCap Credit Agreement" ("MCA"). (*Id.*).

The MCA imposed restrictions on ARCA's use of its assets and until the agreement was terminated in March of 2018, MidCap held a security interest in all of ARCA's assets, including ApplianceSmart and its inventory. (ECF No. 183, Ex. 92 at 70:6–71:23; 90:25–91:3). Further, under the MCA, ARCA covenanted that it would not sell any of its assets, except in the ordinary course of business or as permitted by MidCap, and, separately, that it would not permit any change in control with respect to ApplianceSmart. (ECF No. 183, Ex. 55 at 3, 4, 6, 9). Until the MCA was terminated, MidCap physically held the stock certificate evidencing ARCA's ownership of ApplianceSmart. (ECF No. 183, Ex. 92 at 71:9–23; 85:9–24).

James C. Mahan
U.S. District Judge

- 18 -

The MCA also imposed restrictions on the operations of ARCA and its subsidiaries. Under the MCA, ApplianceSmart received funds that it used to buy inventory, and then remitted its revenues back to MidCap. (*Id*. at 126:18–25). Pursuant to the MCA, proceeds from ApplianceSmart's operations were collected in "lockbox" accounts; the funds in those accounts were swept into a MidCap account daily. (ECF No. 183, Ex. 55 at 5).

The SPA required ARCA to deliver to Live, at closing, "100% of the issued and outstanding capital stock," and that the stock "shall be conveyed free and clear of all Encumbrances [], including, but not limited to those Encumbrances imposed by the MidCap Credit Agreement." (*Id.* at 3).

The SEC contends that the MCA prevented Live from legally acquiring ApplianceSmart on December 30, 2017. According to the SEC, by characterizing ApplianceSmart's payments to MidCap as payments from Live to ARCA, defendants obscure the fact that Live did not have control over ApplianceSmart's revenue until the MCA was terminated.

In support of this proposition, the SEC points to two GAAP provisions relevant to a company's determination of acquisition dates: ASC 805-10-25-6 and 805-10-25-7. (ECF No. 183, Ex. 95 at 233:25–235:16). ASC 805-10-25-6 states that the correct acquisition date "is the date on which it obtains control of the acquiree." (ECF No. 183, Ex. 70 at 1). ASC 805-10-25-7 states:

> The date on which the acquirer obtains control of the acquiree generally is the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree—the closing date. However, the acquirer might obtain control on a date that is either earlier or later than the closing date. For example, the acquisition date precedes the closing date if a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date. An acquirer shall consider all pertinent facts and circumstances in identifying the acquisition date

(*Id.*).

The SEC claims that MidCap still exercised control over ApplianceSmart until the MPA was terminated in March of 2018, and thus it was a violation of GAAP for Live to claim that it had acquired ApplianceSmart in December 2017.

The SEC further alleges that Live treated money paid by ApplianceSmart to MidCap under the MCA as payment by Lie to ARCA.  On April 26, 2018, Live filed a Form 8-K in which Live provided additional information concerning AHS's payment of the ApplianceSmart purchase price.  (ECF No. 183, Ex. 80)  Live disclosed that its subsidiary, ASH, had issued a promissory note to ARCA in the amount of $3,919,494.46.  (*Id.*).

Additionally, the SEC argues that at the time, ASH had not made any payment to ARCA towards the ApplianceSmart purchase price.  (ECF No. 183 at 12)  Rather, the amount of the purported payment disclosed in the press release represented the difference between the total of ApplianceSmart's remittances to MidCap from December 30, 2017, through March 26, 2018, and the total of ApplianceSmart's borrowings under the MCA during the same period.  (ECF No. 183, Ex. 92 at 123:9-22).

### 3.    *SingerLewak Auditors*

Beginning in February 2018, Live retained the accounting firm SingerLewak as its outside auditor.  (*See* ECF No 172, Ex. 130)  SingerLewak was aware of the ApplianceSmart transaction and performed the quarterly review of Live's 2018 Q1 and Q2 financial statements.  (*See id.*)  In fact, SingerLewak designated the ApplianceSmart transaction as a "significant transaction" during their first meeting with Live's Audit Committee on February 13, 2018.  (*See id.*) (ECF No. 172, Ex. 480 at 3)  Defendants hold that SingerLewak examined Live's financial statements and press release regarding the ApplianceSmart purchase and found that December 30, 2017, was the date the transaction was completed.  (*See* ECF No. 172, Exs. 144, 478, 480, 492).

1
2
3
4
5
6

SingerLewak continued to provide audit services for Live until October of 2018.  (ECF No. 183, Ex. 83).  During that time, the firm reviewed, tested, and evaluated the ApplianceSmart transaction.  (*See, e.g.*, ECF No. 172, Exs. 280, 246, 494).  SingerLewak did not identify any material modifications that were necessary to ensure that Live's financial statements complied with GAAP.  (*See* ECF No. 172, Ex. 561).

7
8
9
10
11
12
13

Notwithstanding Live's retention of SingerLewak, the SEC raises several concerns about the characterization of SingerLewak's work.  Among the issues the SEC raises, is the escrow agreement discussed in the SPA.  Live provided SingerLewak with a management representation letter which was signed by Isaac and Johnson which stated that "[t]he shares of ApplianceSmart stock are in escrow and will be released upon payment of the purchase price to third-party lenders of ARCA and ApplianceSmart."  (ECF No. 172, Ex. 144).

14
15
16
17
18
19
20

However, an email Isaac sent to Suzie Doran ("Doran")—a SingerLewak employee— contained a memo Johnson prepared for SingerLewak.  (ECF No. 172, Ex. 426 at 39).  Johnson's memo states that the portion of the SPA mentioning escrow never actually took place.  (*Id.*).  Doran further testified that the existence of an escrow arrangement was "one of the factors that … would have to be considered in determining if transfer of title and ownership had occurred as of December 30, 2017."  (ECF No. 183, 136:23–137:5).

21
22
23
24
25

Doran also testified that she was not aware of the fact that Live had no practical ability to control the use of proceeds from ApplianceSmart's operations until March of 2018, and that the lockbox arrangement was something she would have had additional inquiries on in determining whether control had passed to Live.  (*Id.* at 169:13–25; 170:1–10).

26
27
28

Additionally, the SEC calls into question defendants' reliance on SingerLewak's quarterly review.  SingerLewak stated in its engagement letter with Live that "[a] review is not designed to

provide assurance on internal control over finial reporting or identify significant deficiencies or material weaknesses. It also is not designed, and cannot be relied on, to disclose errors, fraud, or illegal acts, should any exist." (ECF No. 172, Ex. 130 at 3). In fact, reviews are "substantially less in scope than an audit" (ECF No. 172, Ex. 478 at 3) and because audit procedures were not followed, SingerLewak could not definitively conclude that the December 30, 2017, date is accurate. (*See* ECF No. 183, Ex. 88 at 126:13–127:18).

B.    Discussion

1.    *Claim 8: Section 10(b) of the Exchange Act and Rule 10b-5(b) (as to Live, Isaac, and Johnson)*

Defendants move for summary judgment on claim 8. The SEC alleges that defendants violated Section 10(b) and Rule 10b-5(b) by making materially false and misleading statements as to the gain it made from the ApplianceSmart agreement.

The SEC alleges that Live's Form 10-Q for the first quarter of the fiscal year 2018 contained materially false and misleading statements and omissions. The SEC contends that Live improperly recognized $3.7 million in other income as a bargain purchase gain related to the ApplianceSmart acquisition, even though Live did not have effective control of ApplianceSmart, the transaction had not closed, and consideration had not been transferred.

Defendants again argue that their reliance on professionals is a defense to scienter. As discussed *supra* Section IV(B)(i), the court declines to apply this defense.

Because there is a genuine dispute of material fact as to when Live gained control over ApplianceSmart and whether Isaac and Johnson acted with scienter, the court DENIES defendants' motion for summary judgment on claim 8.

James C. Mahan
U.S. District Judge

- 22 -

2.      *Claim 9: Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) (as to Live, Isaac, and Johnson)*

The SEC alleges that Live, Isaac, and Johnson engaged in a scheme to defraud by creating the false appearance the Live had acquired ApplianceSmart on December 30, 2017.  The SEC further alleges that the purpose and effect of the scheme were to allow Live to recognize approximately $3.7 million of other income as a bargain purchase gain to improve performance metrics for the first quarter of 2018.

The SEC claims the payments to ARCA were, in substance, payments by ApplianceSmart to MidCap under the terms of the MidCap Credit Agreement that effectively concealed the fact that Live did not control ApplianceSmart's revenue until March of 2018.  Defendants respond that the MidCap arrangement reflects a customary financing structure in which a third-party lender holds a first-priority security interest in a company's assets and does not affect ownership or control.  (*See* ECF No. 187 at 15–16).  The parties therefore dispute whether Live exercised control over ApplianceSmart during the relevant period.

The parties also dispute whether defendants acted with the requisite scienter.  The SEC alleges that Isaac's statements regarding the placement of stock into escrow, the $2.5 million cash payment, and the transaction's closing date were made to create the appearance that Live had acquired ApplianceSmart despite the absence of effective control.  Defendants maintain that no misstatements were made and that the challenged statements were accurate.

Accordingly, there is a dispute of material fact as to both whether the 2018 Form 10-Q was accurate and whether defendants acted with the requisite scienter.  Summary judgment is thus DENIED.

. . .

James C. Mahan
U.S. District Judge

- 23 -

*3.        Claim 10: Rule 13b2-2 of the Exchange Act (as to Isaac and Johnson)*

Defendants move for summary judgement on claim 10, which alleges Issac and Johnson violated Rule 13b2-2 of the Exchange Act.  Defendants base their motion on arguments concerning the effective date of Live's control over ApplianceSmart.  However, the court has already determined that claims related to the ApplianceSmart agreement are triable.

In addition, the SEC cites a signed management representation letter dated February 14, 2018, sent to Live's outside auditors, stating that Live exercised effective control over ApplianceSmart as of December 30, 2017.  Accordingly, defendants have failed to meet their burden, and a dispute of material fact remains as to claim 10.  Summary judgment is therefore DENIED.

## VI.    Remaining Claims

### A.    Books and Records Claims

Claims 11, 12, 13, 14, and 16 allege violations of Sections 13(a), 13(b)(2)(A), and 13(b)(5) of the Exchange Act and Rules 13a-14, Rules 12b-20, 13a-1, 13a-13, and Rule 13b2-1.  The SEC contends that Live failed to file accurate periodic reports and failed to maintain accurate books and records.  The SEC further alleges that Isaac and Johnson aided and abetted Live's violations.

Both the SEC and defendants rely on the accuracy and legality of the Novalk and ApplianceSmart transactions as the foundation of their arguments.  As explained above, the court denies summary judgment on the principal claims concerning the agreements.  Accordingly, the court also DENIES summary judgment on the reporting and books and records claims.

### B.    Claim 15: Section 13(b)(2)(B) of the Exchange Act

Live, Isaac, and Johnson move for summary judgment on claim 15. In claim 15, the SEC alleges Live failed to devise a system of internal accounting controls in violation of Section

James C. Mahan
U.S. District Judge

13(b)(2)(B) of the Exchange Act.  The SEC also claims that Isaac and Johnson aided and abetted Live in violating Section 13.

Live, Isaac, and Johnson argue that because the Novalk and ApplianceSmart agreements complied with GAAP, Live's internal accounting controls were sufficient.  Because summary judgment was denied on all claims relating to the Novalk and ApplianceSmart agreements, the court likewise DENIES summary judgment here.

C.    Claim 17: Section 14(a) of the Exchange Act and Rule 14a-3 Thereunder

The SEC alleges that Live and Isaac violated Section 14(a) of the Exchange Act and Rule 14a-3 thereunder by failing to fully disclose Isaac's compensation in fiscal years 2016, 2017, and 2018.

To prevail on a claim under Section 14(a), a plaintiff must show that the defendant made a material misrepresentation or omission in a proxy statement and that the misrepresentation or omission was made at lease negligently.  *See Desaigouidar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).  "The requisite state of mind under [Section 14(a)] is negligence." *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 887 (N.D. Cal. 2008).  Rule 14a-3 requires disclosure of all compensation "awarded to, earned by, or paid to" a company's principal executive officer.  17 C.F.R. § 229.402.

Live admits that it did not disclose accrued expense reimbursements in its 2016 Form 10-K.  (ECF No. 172 at 44).  It later disclosed in its 2017 Form 10-K that $54,000 had been accrued during the prior year.  (*Id.*).  Live argues that Item 402(a), which sets forth the general executive compensation disclosure requirements for proxy statements, does not specify whether accrued or actual amounts must be reported.  This distinction is immaterial, however, because Live had a duty to disclose all compensation and failed to do so in at least fiscal year 2016.  (ECF No. 94 at 9).

James C. Mahan
U.S. District Judge

- 25 -

Although the SEC contends that the disclosure requirement does not depend on the materiality of the information (ECF No. 183 at 42), materiality remains an essential element of a Section 14(a) claim. *See Desaigouidar*, 223 F.3d at 1022. Whether the omission of Isaac's compensation was material presents a genuine dispute of material fact properly left for the jury. *See Marx v. Computer Scis. Corp.*, 507 F.2d 485, 492 (9th Cir. 1974).

Accordingly, summary judgment is DENIED as to claim 17.

**VII.    Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion for summary judgment (ECF No. 172) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that the SEC's motion for summary judgment (ECF No. 173) be, and the same hereby is, DENIED.

DATED February 9, 2026.

_____
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge